EUGENE VOLOKH (SBN 194464)
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone: (310) 206-3926
Facsimile: (310) 206-7010
eugene.volokh@gmail.com

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 1610
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

DOE PUBLIUS and DEREK HOSKINS,

Plaintiffs,

v.

DIANE F. BOYER-VINE, in her official capacity as Legislative Counsel of California,

Defendant.

Case No.: 1:16-CV-01152-LJO-SKO

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: Feb. 6, 2017
Hearing Time: 8:30 a.m.
Judge: Hon. Lawrence J. O'Neill
Courtroom 4, Seventh Floor
Action Filed: Aug. 5, 2016

**TABLE OF CONTENTS**

I. Introduction ..... 1
II. Background ..... 2
A. Plaintiffs Republished Home Addresses That They Found Publicly Available, and That California Law Says Must Be Publicly Available. ..... 2
B. Section 6254.21(c) Purports To Vest Government Officials With The Authority To Censor Republication Of Their Home Addresses. ..... 4
C. Publius Republished Publicly Available Legislator Address Information In The Course Of Protesting Recent Gun Legislation. ..... 5
D. Legislative Counsel Issues A Takedown Demand And The Post Is Censored. ..... 6
E. Legislative Counsel Censors Discussion About The Controversy Over The Original Censoring Of Publius' Post. ..... 7
III. Argument ..... 9
A. Section 6254.21(c) Violates The First Amendment, Both On Its Face And As Applied. ..... 9
1. Section 6254.21(c) Is A Content-Based Restriction On Speech That Conveys Information From The Public Domain. ..... 9
2. Section 6254.21(c) Restricts A Substantial Amount Of Constitutional Protected Speech Connected To Political Advocacy. ..... 11
3. Section 6254.21(c) Cannot Pass Strict Scrutiny. ..... 12
B. Applying § 6254.21(c) To Out-Of-State Actors Violates the Commerce Clause. ..... 16
C. Applying § 6254.21(c) To Hoskins And Other Computer Service Providers Violates 47 U.S.C. § 230 ..... 18
B. The Remaining Preliminary Injunction Factors Weigh In Plaintiffs' Favor. ..... 19
1. Plaintiffs Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction. ..... 19
2. The Balance Of Equities Tips In Plaintiffs' Favor. ..... 19
3. A Preliminary Injunction Is In The Public Interest. ..... 20
IV. Conclusion ..... 20

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......... 20

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 9

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) .......... 17, 18

*Am. Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) .......... 20

*Am. Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) .......... 17

*Am. Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) .......... 17

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .......... 9

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) .......... 12

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .......... 10

*Brayshaw v. Tallahassee*,
709 F. Supp. 2d 1244 (N.D. Fla. 2010) .......... 16

*Carey v. Brown*,
447 U.S. 455 (1980) .......... 11

*Center for Democracy & Tech. v. Pappert*,
337 F. Supp. 2d 606 (E.D. Pa. 2004) .......... 17

*Cohen v. California*,
403 U.S. 15 (1971) .......... 16

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 10, 13

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......... 18

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 17

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 19

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......... 18

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989) .......... *passim*

*Frisby v. Schultz*,
487 U.S. 474 (1988) .......... 11

*Fuller v. Bowen*,
203 Cal. App. 4th 1476 (2012) .......... 11

*Goldie's Bookstore, Inc. v. Super. Ct.*,
739 F.2d 466 (9th Cir. 1984) .......... 19

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......... 20

*Healy v. Beer Institute*,
491 U.S. 324 (1989) .......... 17, 18

*Joelner v. Vill. of Wash. Park*,
378 F.3d 613 (7th Cir. 2004) .......... 19

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) .......... 19, 20

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) .......... 19

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014) .......... 10

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......... 20

*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*,
669 F.3d 374 (3d Cir. 2012) .......... 20

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 16

*Organization for Better Austin v. Keefe*,
402 U.S. 415 (1971) .......... 12

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) .......... *passim*

*People v. Wright*,
2016 WL 3092688 (Cal. Ct. App. May 24, 2016) .......... 11

*PSINet, Inc. v. Chapman*,
362 F.3d 227 (4th Cir. 2004) .......... 17

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) .......... 10

*Sammartano v. First Judicial Dist. Ct.*,
303 F.3d 959 (9th Cir. 2002) .......... 19, 20

*Sanders Cnty. Republican Cent. Comm. v. Bullock*,
698 F.3d 741 (9th Cir. 2012) .......... 19

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) .......... 20

*Sheehan v. Gregoire*,
272 F. Supp. 2d 1135 (W.D. Wash. 2003) .......... 15

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) .......... 10, 15

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 16

*Stormans, Inc. v. Stelecky*,
586 F.3d 1109 (9th Cir. 2009) .......... 19

*Texas v. Johnson*,
491 U.S. 397 (1989). .......... 16

*Valle Del Sol Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013) .......... 19

*Winter v. Natural Res. Defense Council, Inc.*,
555 U.S. 7 (2008) .......... 9

**Statutes**

Cal. Gov't Code § 6254.21 .......... *passim*

Cal. Const., art. IV, § 2(c) .......... 3

Cal. Elec. Code § 8040 .......... 3

Cal. Elec. Code § 2150(a)(3) .......... 13

Cal. Elec. Code § 2166(a) .......... 4

Cal. Elec. Code § 2194(a)(3) .......... 4, 13

Cal. Penal Code § 11106 .......... 5

Communications Decency Act of 1996, 47 U.S.C. § 230 .......... 2, 18

S.B. No. 1235 (2015-2016 Reg. Sess.), ch. 55, § 12 .......... 5

U.S. Const. amend. II .......... 5

U.S. Const. art. I, § 8, cl. 3 .......... 16

**Other Authorities**

Burst Updates, *State Warns Site to Remove List of Senators Who Passed Gun Control Requiring Personal Info on Owners: Update, Post Content Deleted*, July 11, 2016, online at http://bit.ly/2avhf7l .......... 8

Editorial Board, *Gun activists' speech may be legal, but it's creepy and reprehensible*, L.A. Times, Aug. 10, 2016, http://lat.ms/2h4w2c7 .......... 7

Gavin Rozzi, *Former Toms River Mayor in Trouble For Code Violations*, Ocean County Politics, July 7, 2016, http://bit.ly/2hiqrBl .......... 11

Louis Jacobson, *Critics say Elizabeth Warren 'lives in a $5.4 million mansion'*, Oct. 29, 2014, online at http://bit.ly/1wQyoQf .......... 12

Manchester Patch, *Manchester Mayor Lives In Gated Community!*, July 24, 2014 http://bit.ly/2gWmwHu .......... 12

Miami-Dade Commission on Ethics & Public Trust, *Preliminary Inquiry Report re: Jose M. Diaz*, Oct. 2, 2014, online at http://bit.ly/2hr5SQN .......... 11

Michael Campbell, *Petersburg Mayor Myers: Trash left in street not his; has been removed*, WSMV-TV, July 28, 2016, online at http://bit.ly/2hiAGFY .......... 11

NBC Los Angeles, *Protests Outside LA Mayor's Home Over Police Shooting*, http://www.nbclosangeles.com/news/local/Ezell-Ford-LAPD-Police-Shooting-Protest-Mayor-Eric-Garcetti-306487831.html .......... 11

Patrick McGreevey, *Gov. Jerry Brown signs bulk of sweeping gun-control package into law, vetoes five bills*, L.A. Times, July 1, 2016, http://lat.ms/29bvT5P .......... 5

Sacramento County Clerk Recorder, Online Index of Recorded Documents, http://www.ccr.saccounty.net/DocumentRecording/Pages/Index.aspx .......... 3

Stephanie Ebbert, *Apparent violation missed in senator's home expansion*, Boston Globe, May 15, 2015, online at http://bit.ly/2gWcshm .......... 11

ZabaSearch, Frequently Asked Questions, online http://www.zabasearch.com/faq/ .......... 3

# I. INTRODUCTION

This is a constitutional and federal statutory challenge to California Government Code § 6254.21(c). Section 6254.21(c) lets government officials suppress the online republication of their home addresses or telephone numbers—even when the address or telephone number is already available in public records—if they claim the republication has caused them to "fear for [their] safety."

Plaintiff Doe Publius maintains a political blog under the alias "The Real Write Winger." Publius posted a blog entry criticizing the California Legislature for passing several laws that Publius believes undermine the rights of California gun owners, including a law establishing a registry tracking all ammunition purchases and transfers. Publius characterized state lawmakers as "tyrants" and announced the establishment of a "tyrant registry" that listed the home addresses and telephone numbers of 40 legislators who voted to pass the bills Publius was protesting. The post states that Publius obtained the information through publicly available sources—indeed, a simple Internet search for each name on the list instantly reveals the legislator's home address.

The California Legislative Counsel sent a letter to WordPress.com (the Internet hosting service for Plaintiff's blog) demanding that it remove the post under § 6254.21(c). WordPress disabled the post and removed it from the Internet. This "takedown statute" bars Publius from reposting this content for four years. Cal. Gov't Code § 6254.21(c)(1)(C).

The Legislative Counsel's censorship of Publius generated controversy around the country. But the Legislative Counsel doubled down, broadening its net and issuing takedown demands to other blogs and online discussion forums originating far outside California. Plaintiff Derek Hoskins, who owns a New-England-based online forum, received a takedown demand after a forum participant reposted the legislators' address information from Publius' post, stating, "They [the legislators] must realize after [their contact information is] on the web, it can be copied by others and posted somewhere else over and over. Like this."

Section 6254.21(c)'s takedown requirement violates the First Amendment on its face and as applied to Plaintiffs. Speakers like Publius are constitutionally entitled to publish factual information related to government officials, especially when the information is already in the

public domain. And this includes home addresses and phone numbers, which are necessary to constitutionally protected speech (e.g., organizing constitutionally protected residential picketing, or demonstrations in the legislators' neighborhoods), or, as here, fundamental to the message itself.

Accordingly, the takedown requirement is unconstitutional unless the State shows that it satisfies strict scrutiny. And the State cannot show this, because § 6254.21(c) is not narrowly tailored to a compelling interest. California cannot have a compelling interest in forbidding publication of officials' home address, given the many California policies allowing or even *requiring* disclosure of such addresses. And if the State does decide that it must protect against disclosure of home address information for security reasons, it can do so in the future by not placing this information in the public domain—but not by imposing content-based restrictions on private speech.

The State's takedown demand to Hoskins, an out-of-state speaker, also violates the Dormant Commerce Clause: It attempts to regulate Internet speech that occurs wholly outside California. Federal courts have repeatedly struck down state statutes that restrict out-of-state speech, even when they are aimed at protecting the state's own residents from harms that the speech can potentially cause.

Finally, demanding that Internet service providers like Hoskins remove and monitor content posted by third parties violates 47 U.S.C. § 230 (a provision enacted as part of the Communications Decency Act of 1996). Through the Northeastshooters forum, Hoskins provides an "interactive computer service," through which users (*i.e.*, "information content provider[s]") can freely post information on the site. Section 230 bars Hoskins from being responsible for such content posted by third parties.

## II. BACKGROUND

### A. Plaintiffs Republished Home Addresses That They Found Publicly Available, and That California Law Says Must Be Publicly Available.

There is no dispute that all the home addresses at issue in this case are publicly available through a variety of sources. Publius found the addresses and phone numbers listed in his article through a simple Internet search. Publius Decl. ISO Prelim. Inj., ¶ 4. He needed only one website

to compile all of the addresses—www.zabasearch.com. *Id.* Zabasearch states that it obtains all of its information from publicly available data. *See* ZabaSearch, Frequently Asked Questions, online http://www.zabasearch.com/faq/ (explaining that "[a]ll information found using ZabaSearch comes from public records databases," which "means information collected by the government, such as court records, country records, [and] state records"). All 40 addresses at issue here remain accessible to this day from Zabasearch and other websites, including YellowPages.com, Nuwber.com, and Spokeo.com. *See* Duvernay Decl. ISO Prelim. Inj., ¶¶ 3–4 & Ex. C.

Home address information for California government officials is available from a variety of government sources, including:

- *Property records*. California law does not conceal the home address information of public officials in property records. These records are available to all citizens at recorders' offices. Some counties allow for online ordering of copies of recorded documents. *See, e.g.*, Sacramento County Clerk Recorder, Online Index of Recorded Documents, http://www.ccr.saccounty.net/DocumentRecording/Pages/Index.aspx. And private companies have, entirely lawfully, gathered this information and made it available online.

- *Voting records*. To run for the Legislature, candidates must reside in—and be registered to vote in—their district. Cal. Const., art. IV, § 2(c) ("A person is ineligible to be a member of the Legislature unless the person is an elector and has been a resident of the legislative district for one year…."). How do citizens find out whether a candidate satisfies the residency requirement? Candidates must list their home address and phone numbers on their declaration of candidacy, Cal. Elec. Code § 8040, and their home address is likewise listed on their voter registration affidavit. *Id.* § 2150(a)(3). And the information contained in local voting affidavits—including home addresses—

> *[s]hall be provided with respect to any voter*, subject to the provisions of Sections 2166.5, 2166.7, and 2188, to any candidate for federal, state, or local office, to any committee for or against any initiative or referendum measure for which legal publication is made, and *to any person for election, scholarly, journalistic, or political purposes*….

Cal. Elec. Code § 2194(a)(3) (emphasis added).

The few exceptions to this state policy of mandatory disclosure of voter address information are very narrow, and contrast sharply with the broad powers of suppression granted in § 6254.21(c). *See* Cal. Elec. Code § 2166(a) (allowing voter information to be "declared confidential upon order of a superior court issued upon a showing of good cause that a life-threatening circumstance exists to the voter or a member of the voter's household"); *id.* § 2166.5 (allowing voters to have their information "declared confidential upon presentation of certification that the person is a participant in the Address Confidentiality for Victims of Domestic Violence, Sexual Assault, and Stalking"); *id.* § 2166.7 (allowing county boards of supervisors to permit "public safety officers" to have their voter registration information made confidential).

**B. Section 6254.21(c) Purports To Vest Government Officials With The Authority To Censor Republication Of Their Home Addresses.**

Section 6254.21(c) empowers virtually all elected or appointed officials in California to prevent citizens from republishing the officials' home addresses if they feel that such republication threatens them:

> (c)(1)(A) No person . . . shall . . . publicly display on the Internet the home address or telephone number of any elected or appointed official if that official has . . . made a written demand of that person . . . to not disclose his or her home address or telephone number.
>
> (B) A written demand made under this paragraph by [certain state officials] shall include a statement describing a threat or fear for the safety of that official or of any person residing at the official's home address.
>
> (C) A written demand made under this paragraph by an elected official shall be effective for four years . . . .
>
> (D)(i) A person . . . that receives the written demand of an . . . official pursuant to this paragraph shall remove the official's home address or telephone number from public display on the Internet . . . within 48 hours . . . .
>
> (ii) After receiving the . . . official's written demand, the person, business, or association shall not transfer the . . . official's home address or telephone number to any other person . . . .
>
> (2) An official whose home address or telephone number is made public as a result of a violation of paragraph (1) may bring an action seeking injunctive or declarative relief in any court of competent jurisdiction. If a court finds that a violation has occurred, it may grant injunctive or declarative relief and shall award the official court costs and reasonable attorney's fees. . . .
>
> (3) An . . . official may designate in writing . . . [one of a certain class of entities] as

> that official's agent with regard to making a written demand . . . . A written demand made by an agent pursuant to this paragraph shall include a statement describing a threat or fear for the safety of that official or of any person residing at the official's home address.

In short, once public officials demand that their addresses or phone numbers be removed from the Internet, the publisher has 48 hours to comply, or be subject to an action whereby they "shall" pay the public official's attorney's fees. Moreover, the publisher would then be barred from republishing the official's address or phone number—for any purpose—for four years.

### C. Publius Republished Publicly Available Legislator Address Information In The Course Of Protesting Recent Gun Legislation.

Publius maintains a political blog under the alias "The Real Write Winger," https://therealwritewinger.wordpress.com/. Publius Decl. ISO Prelim. Inj., ¶ 2. The blog focuses on California politics, with a particular emphasis on criminal law, civil rights and liberties, and the right to keep and bear arms secured by the Second Amendment to the U.S. Constitution. *Id.*

On July 1, 2016, Governor Jerry Brown signed several gun-control bills into law. *See* Patrick McGreevey, *Gov. Jerry Brown signs bulk of sweeping gun-control package into law, vetoes five bills*, L.A. Times, July 1, 2016, http://lat.ms/29bvT5P. Included in this package of legislation was a law that, among other things, requires the State to establish and maintain a database tracking all ammunition purchases throughout California. S.B. No. 1235 (2015-2016 Reg. Sess.), ch. 55, §§ 12, 14 (enacting Cal. Penal Code §§ 30352 and 30369). The ammunition database will include the driver's license information, residential address and telephone number, and date of birth for everyone who purchases or transfers ammunition. *See id.* Unsurprisingly, many people view this as a serious privacy violation. While California has for several years maintained a database of citizens who *purchase* firearms from licensed dealers, *see* Cal. Penal Code § 11106, no state compiles a registry of all firearms *owners*—or, as here, a proxy registry built by tracking ammunition purchasers.

On July 5, 2016, Publius posted a blog entry harshly criticizing the legislators who voted for these new laws. Publius believes the legislation, including the State's collection of personal information for ammunition purchases, infringes on the privacy and liberty interests California gun owners. Publius Decl., ¶ 3. The entire article, titled "Tyrants to be registered with California gun

owners," states:

> If you're a gun owner in California, the government knows where you live. With the recent anti gun, anti Liberty bills passed by the legisexuals in the State Capitol and signed into law by our senile communist governor, isn't it about time to register these tyrants with gun owners?
>
> Compiled below is [sic] the names, home addresses, and home phone numbers of all the legislators who decided to make you a criminal if you don't abide by their dictates. "Isn't that dangerous, what if something bad happens to them by making that information public?" First, all this information was already public; it's just now in one convenient location. Second, it's no more dangerous than, say, these tyrants making it possible for free men and women to have government guns pointed at them while they're hauled away to jail and prosecuted for the crime of exercising their rights and Liberty.
>
> These tyrants are no longer going to be insulated from us. They used their power we entrusted them with to exercise violence against us if we don't give up our rights and Liberty. This common sense tyrant registration addresses this public safety hazard by giving the public the knowledge of who and where these tyrants are in case they wish to use their power for violence again.
>
> So below is the current tyrant registry. These are the people who voted to send you to prison if you exercise your rights and liberties. This will be a constantly updated list depending on future votes, and if you see a missing address or one that needs updating, please feel free to contact me. And please share this with every California gun owner you know.
>
> To be fair, the only way for a tyrant to have their name removed from the tyrant registry is to pass laws which repeal the laws that got them added to the list, or upon the tyrant's death. Otherwise, it is a permanent list, even after the tyrant leaves office. The people will retain this information and have access to it indefinitely.

The article then listed the home addresses and phone numbers of 14 members of the California State Senate and 26 members of the California State Assembly. Publius Decl., ¶ 3–5, & Dkt. No. 1-1.

### D. Legislative Counsel Issues A Takedown Demand And The Post Is Censored.

On or before July 11, the California Legislative Counsel sent a written demand to WordPress.com (the Internet hosting service for Publius' blog), threatening to pursue a lawsuit if WordPress did not remove the post pursuant to § 6254.21(c):

> To whom it may concern:
>
> My office represents the California State Legislature. It has come to our attention that the home addresses of 14 Senators and 26 Assembly Members have been publically posted on an Internet Web site hosted by you without the permission of these elected officials. Specifically, the user on your platform by the name of "therealwritewinger" posted the home addresses of these elected officials on his or

> her Web site . . . .
>
> This letter constitutes a written demand under subdivision (c) of Section 6254.21 of the Government Code that you remove these home addresses from public display on that Web site, and to take steps to ensure that these home addresses are not reposted on that Web site . . . or any other Web site maintained or administered by WordPress.com or over which WordPress.com exercises control. Publicly displaying elected officials' home addresses on the Internet represents a grave risk to the safety of these elected officials. On the "therealwritewinger" blog site, the user describes the listed legislators as "tyrants," encourages readers to share the legislators' home addresses with other gun owners, and threatens that the home addresses will not be removed unless the legislator repeals specified gun laws or "upon the tyrant's death." The Senators and Assembly Members whose home addresses are listed on this Web site fear that the public display of their addresses on the Internet will subject them to threats and acts of violence at their homes.
>
> To comply with the law, please remove the home addresses of these elected officials from your Web site no later than 48 hours after your receipt of this letter . . . . You are also required to continue to ensure that this information is not reposted on that Web site . . . or any other Web site maintained by you . . . . [¶] . . . . If these home addresses are not removed from this Web site in a timely manner, we reserve the right to file an action seeking injunctive relief, as well as associated court costs and attorney's fees (para. (2), subd. (c), Sec. 6254.21, Gov. C.).
>
> Regards,
> Kathryn Londenberg
> Deputy Legislative Counsel

Publius Decl., ¶ 6, & Ex. B.

In response to the State's demand and threat of litigation, WordPress disabled Publius' post and removed it from the Internet. *Id.* Publius and WordPress are now barred from reposting this information for four years. Cal. Gov't Code § 6254.21(c)(1)(C). But for § 6254.21(c) and Defendant's demand (and the threat of statutory sanctions), Publius would re-post the legislators' addresses and phone numbers, and would leave such information on the Internet. *Id.*, ¶ 7.

**E. Legislative Counsel Censors Discussion About The Controversy Over The Original Censoring Of Publius' Post.**

The State's censorship of Publius generated interest in California, *see, e.g.*, Editorial Board, *Gun activists' speech may be legal, but it's creepy and reprehensible*, L.A. Times, Aug. 10, 2016, http://lat.ms/2h4w2c7, and as far away as New England.

Plaintiff Derek Hoskins owns and moderates Northeastshooters.com, a popular New England online forum for discussing firearms issues and shooting sports activities. Hoskins Decl. ISO Prelim. Inj., ¶ 2. Through Northeastshooters, Hoskins seeks to provide a forum that allows

uninhibited debate; citizens often discuss firearms laws and legislation on the site. *Id.* Forum participants discussed the State's censorship of Publius in a discussion thread titled "GOVERNMENT WARNS SITE TO REMOVE LIST OF STATE SENATORS WHO PASSED GUN CONTROL." Hoskins Decl., ¶ 4, & Ex. A. One commenter stated, "Can't speak for California, but here in Connecticut, home addresses of an elected official is a matter of public record." *Id.*, Ex. A, at 3. Another characterized the dispute as "Laws for thee, but not for me . . . ." *Id.*, Ex. A, at 1. Another commenter, identified as "headednorth" stated "[t]hey must realize after its [sic] on the web, it can be copied by others and posted somewhere else over and over. Like this," and then reposted the California legislators' home addresses. *Id.*, Ex. A, at 4–5. Nowhere did any of these commenters repeat or copy any of the vituperative language from Publius' original post.

Yet, on July 11, 2016, the Legislative Counsel's office sent Hoskins an email noting that "headednorth" had posted the home addresses of California legislators and demanding that Hoskins immediately remove the addresses from the site. Hoskins Decl., ¶ 3, & Ex. B. This demand claimed that simply "displaying elected officials home addresses on the Internet represents a grave risk to the safety of these elected officials," and that the officials "fear that the public display of their addresses on the Internet will subject them to threats and acts of violence at their homes." *Id.* The email closed with a threat of litigation.

Hoskins responded to the government's threat by removing the post. Hoskins Decl., ¶ 5. But for § 6254.21(c) and Defendant's demand (and the threat of statutory sanctions), Hoskins would not have removed the legislators' contact information, and would not have undertaken any effort to ensure that such information was not reposted on Northeastshooters.com. *Id.*

Another website, known as "Burst Updates," reported on Plaintiff's post and the State's demand that it be taken down. Burst Updates, *State Warns Site to Remove List of Senators Who Passed Gun Control Requiring Personal Info on Owners: Update, Post Content Deleted*, July 11, 2016, online at http://bit.ly/2avhf7l. The Burst Updates post included a link to the original WriteWinger post, a short quote from the original post, some original content (encouraging readers to see the original post) and a copy of the list of legislators' address included in the original post.

*See id.* The Office of Legislative Counsel issued a similar takedown demand under Section 6254.21(c), asserting that Burst Updates' separate post also constituted a "grave" threat by listing legislators' addresses. *Id.*

## III. ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, "a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

An injunction is warranted under either formulation.

### A. Section 6254.21(c) Violates The First Amendment, Both On Its Face And As Applied.

#### 1. Section 6254.21(c) Is A Content-Based Restriction On Speech That Conveys Information From The Public Domain.

Section 6254.21(c)'s takedown requirement violates the First Amendment on its face and as applied to Plaintiffs. Section 6254.21(c) is a content-based speech restriction that forbids the communication of information that is already in the public domain (and that, in many cases, the government itself has placed in the public domain). And this information is relevant—indeed, often necessary—to political advocacy.

Section 6254.21(c) singles out speech of a particular content: speech that reveals the address or telephone number of legislators. *See, e.g.*, *Ostergren v. Cuccinelli*, 615 F.3d 263, 271, 287 (4th Cir. 2010) (treating a state statute that banned publishing social security numbers as content-based and thus subject to invalidation unless it is narrowly tailored to a compelling government interest). In that respect, § 2654.21(c) is similar to the ban on publishing the names of rape victims, which was struck down using strict scrutiny in *Florida Star v. B.J.F.*, 491 U.S. 524, 537 (1989). Section 6254.21(c) "target[s] speech based on its communicative content," *Reed v.*

*Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); speech that communicates addresses and telephone numbers is seen as dangerous because of what it communicates, not because it is (say) too loud or likely to block traffic. Moreover, a law is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014). And § 6254.21(c) requires precisely that, because enforcement authorities must examine an Internet post to determine whether it contains an official's address or telephone number.

And § 6254.21(c) punishes even speech that is widely available in the public domain. Once "truthful information [has been] 'publicly revealed' or [is] 'in the public domain,'" the State cannot "constitutionally restrain its dissemination." *Florida Star*, 491 U.S. at 535 (striking down Florida statute that imposed liability on publishing name of rape victim, because statute applies even where publisher obtained victim's name from publicly available police report); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (striking down Oklahoma statute that criminalized republication of rape victim identity obtained from public records); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) (striking down West Virginia statute making it a crime to publish name of juvenile charged with an offense after newspaper was indicted for publishing name it lawfully obtained by monitoring police radio transmissions).

"As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quoting *Daily Mail*, *supra*, 443 U.S. at 102)). When a state places "information in the public domain," "the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Cox Broad. Corp.*, 420 U.S. at 495. Indeed, in *Bartnicki*, the Court applied these principles to strike down even a statute that imposed liability on republishing a conversation that had been *illegally wiretapped* by a third party. 532 U.S. at 525–29.

///

///

**2. Section 6254.21(c) Restricts A Substantial Amount Of Constitutionally Protected Speech Connected To Political Advocacy.**

The personal address information and telephone numbers of public officials is often closely connected to political debates. For example, the First Amendment protects residential picketing of government officials, unless the officials live in those jurisdictions that have enacted special content-neutral restrictions on such picketing. *See Carey v. Brown*, 447 U.S. 455, 460 (1980) (holding that residential picketing is "expressive conduct that falls within the First Amendment's preserve"); *Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (upholding a content-neutral restriction on such picketing); NBC Los Angeles, *Protests Outside LA Mayor's Home Over Police Shooting*, http://www.nbclosangeles.com/news/local/Ezell-Ford-LAPD-Police-Shooting-Protest-Mayor-Eric-Garcetti-306487831.html. And even when there is a content-neutral ban on targeted residential picketing, such a ban is constitutional only because it "leaves open ample alternative channels," such as "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Frisby*, 487 U.S. at 483. Yet to organize targeted picketing, a march on an official's home block, or a march through the official's neighborhood, people must be free to communicate to each other where that event should take place.

Moreover, the home addresses of government officials are often relevant to debates about whether the officials live in the districts that they represent.[1] They are often relevant to whether the officials' own homes are in violation of city ordinances.[2] They are often relevant to disputes about whether officials are living in gated communities, or are otherwise removed from their

---

[1] For example, former State Senator Roderick Wright faced a high-profile, multi-year prosecution for not living where he was registered to vote. *See People v. Wright*, 2016 WL 3092688 (Cal. Ct. App. May 24, 2016) (affirming conviction). Former State Senator Tom Berryhill faced questions—and litigation—over whether he lived in Senate District 14. *See Fuller v. Bowen*, 203 Cal. App. 4th 1476 (2012). A residency dispute arises nearly every election cycle.

[2] *See, e.g.*, Michael Campbell, *Petersburg Mayor Myers: Trash left in street not his; has been removed*, WSMV-TV, July 28, 2016, online at http://bit.ly/2hiAGFY; Miami-Dade Commission on Ethics & Public Trust, *Preliminary Inquiry Report re: Jose M. Diaz*, Oct. 2, 2014, online at http://bit.ly/2hr5SQN; Stephanie Ebbert, *Apparent violation missed in senator's home expansion*, Boston Globe, May 15, 2015, online at http://bit.ly/2gWcshm; Gavin Rozzi, *Former Toms River Mayor in Trouble For Code Violations*, Ocean County Politics, July 7, 2016, http://bit.ly/2hiqrBl.

constituents.[3]

Likewise, there is no law forbidding telephone calls to officials' homes; such calls may often contain constitutionally protected political advocacy, and publishing the telephone numbers may facilitate such calls. The constraint on such calls stems from social norms, not from law; publicizing the phone numbers, which would make the calls possible, likewise cannot be outlawed. Indeed, in *Organization for Better Austin v. Keefe*, 402 U.S. 415 (1971), the Supreme Court held that petitioners' leafletting in a real estate agent's home neighborhood could not be enjoined even though "two of the leaflets requested recipients to call respondent at his home phone number and urge him to [comply with the leafletters' demands]," *id.* at 417; if such speech is protected when said about a small businessman, it must be protected when said about a high government official.[4]

And, as here, publicizing an official's home address and telephone number is a means of condemning what speakers view as the official's violation of citizens' privacy. *Cf. Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) and discussion *infra*. This was the motivation for Publius' blog entry: Informing others that Publius was establishing a "common sense tyrant registration" as a protest measure against the State's efforts to compile information about gun owners was the very point of the post. As Publius explained, "If you're a gun owner in California, the government knows where you live. . . . [I]sn't it about time to register these tyrants with gun owners?" Likewise, "headednorth" re-posted the list on Hoskins' site to emphasize the futility of the State's attempts to censor republication of public information on the Internet.

**3. Section 6254.21(c) Cannot Pass Strict Scrutiny**

California cannot justify § 6254.21(c) on the grounds that it is narrowly tailored to a compelling government interest. California law *requires* that home address information for all voters—including state legislatores—be made available for "election, scholarly, journalistic, or

3 Manchester Patch, *Manchester Mayor Lives In Gated Community!*, July 24, 2014 http://bit.ly/2gWmwHu; Louis Jacobson, *Critics say Elizabeth Warren 'lives in a $5.4 million mansion'*, Oct. 29, 2014, online at http://bit.ly/1wQyoQf.

4 Plaintiffs are challenging the statute as facially overbroad and as applied to them. These examples demonstrate how the statute is unconstitutionally overbroad, because it restricts "a substantial amount of protected speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).

political purposes." Cal. Elec. Code §§ 2150(a)(3), 2194(a)(3). California law makes property records, including the names and addresses of the property owners, publicly available.

If California had a general policy of keeping people's home addresses confidential or exempted public officials from the policy that home addresses are public, there might be more of an argument that there is a compelling interest in barring citizens from disclosing public officials' home addresses. Since California does neither, however, it cannot prevent citizens from republishing the very information that the State itself communicates.

The logic of the Supreme Court's *Florida Star* decision makes clear that § 6254.21(c) is facially overbroad. In *Florida Star*, the Court struck down a judgment imposing liability on a newspaper for publishing the name of a rape victim; a police officer had erroneously released the name to reporters, in violation of police department policy. The law was defended on the grounds that the government had compelling interests in protecting victim privacy, preventing physical attacks aimed at silencing the victims, and encouraging victims to come forward. But the Court held that the law was not narrowly tailored to those interests.

First, the Court noted that imposing liability on publishing information that the government placed in the public domain—in that case, mistakenly placed—was not narrowly tailored.

> [W]here the government itself provides information to the media, it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech. . . . . Florida's policy against disclosure of rape victims' identities . . . was undercut by the Department's failure to abide by this policy. Where, as here, the government has failed to police itself in disseminating information, . . . the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity.

491 U.S. at 538. Thus, even a government mistake in failing to comply with the government's own no-disclosure policy fatally "undercut[s]" the constitutionality of a state "policy against disclosure" by private speakers. It follows that an active policy *in favor of* disclosure by the government fatally undercuts any state policy of restricting similar private disclosure.

Likewise, in *Cox Broadcasting*, the Court rejected a claim that a rape victim's privacy interests justified liability for republishing identifying information disclosed in a trial: "If there are privacy interests to be protected in judicial proceedings, the States must respond by means which

avoid public documentation or other exposure of private information" in the first instance. 420 U.S. at 496. "*Cox Broadcasting* and its progeny indicate that punishing truthful publication of private information will almost never be narrowly tailored to safeguard privacy when the government itself released that information." *Ostergren*, 615 F.3d at 280.

Second, the "broad sweep" of the law in *Florida Star* kept the law from being narrowly tailored because there were "no case-by-case findings that the disclosure of a fact about a person's private life" was unwarranted. 491 U.S. at 539. "On the contrary . . . liability follows automatically from publication. This is so regardless of whether the identity of the victim is already known throughout the community." *Id*. Likewise, under § 6254.21(c), all that is required for censorship of speech is a letter from a public official stating a subjectively perceived "threat or fear for [his or her] safety." If the letter's recipient refuses to yield, the official may bring an action for the "violation" and automatically obtain attorney's fees. Cal. Gov. Code § 6254.21(c)(2). There is no case-by-case determination of whether the publication of personal address information is actually dangerous, and whether the official's address—the analog to the "identity of the victim" in *Florida Star*—"is already known throughout the community" because of its presence in public records.

Plaintiff Hoskins' experience illustrates the vast overreach of the statute. The Legislative Counsel invoked the statute to censor an online discussion forum on the other side of the country, and to a post in which the commentator merely copied the legislators' addresses—with no commentary that could possibly be deemed threatening. "Headednorth" was simply protesting the censorship of public information on the Internet. Yet the Legislative Counsel asserted that the mere republication of this list "represents a grave risk to the safety of these elected officials," and that the officials "fear that the public display of their addresses on the Internet will subject them to threats and acts of violence at their homes." Hoskins Decl., ¶ 3, & Ex. B. Were Hoskins to fight, he would face automatic liability under the statute, since the statute does not contemplate any review of this subjective evaluation of threat. This is not narrow tailoring.

Third, the "facial underinclusiveness" of the statute here, as in *Florida Star*, "raises serious doubts about whether [the State] is, in fact, serving" the interest it claims. 491 U.S. at 540. The

statute there banned publication of rape victim's names in an "instrument of mass communication," but "[w]hen a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. Where important First Amendment interests are at stake, the mass scope of disclosure is not an acceptable surrogate for injury." *Id.*; *see also Daily Mail*, 443 U.S. at 104–05 ("statute does not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names of youths charged in a juvenile proceeding"). Likewise, here, targeting only the publication of information on the Internet is unconstitutionally underinclusive.

Indeed, the other courts that have considered similar speech restrictions have struck them down for these very reasons. *Ostergren v. Cuccinelli*, 615 F.3d 263, *supra*, is closely analogous. In *Ostergren*, a privacy advocate posted on the Internet publicly available property records with unredacted Social Security numbers of Virginia legislators and public officials; Ostergren was protesting the government's failure to redact SSNs as it moved all property records into an online system, something that Ostergren saw as an undue interference with citizen privacy. *Id.* at 266–70. The Fourth Circuit held that Virginia could not prosecute Ostergren for her actions, *id.* at 286–87, partly because "[t]he unredacted SSNs on Virginia land records that Ostergren has posted online are integral to her message. Indeed, they *are* her message." *Id.* at 271 (emphasis in original). The same reasoning applies to this case.

Likewise, in *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W.D. Wash. 2003), the court invalidated a ban on disseminating the "residential address, residential telephone number, birthdate, or social security number" of law enforcement personnel "with the intent to harm or intimidate" them. *Id.* at 1139. Plaintiff had posted such information on his website (www.justicefiles.com) to advocate for police accountability. *Id.* The court held that the statute was an impermissible content-based speech restriction, which failed strict scrutiny under *Florida Star* because it banned publishing "truthful lawfully obtained, publicly-available personal identifying information with respect to a matter of public significance: police accountability." 272 F. Supp. 2d at 1145–46. "[W]hen the government itself places information in the public domain, it

must be presumed that the government concludes the public interest is thereby served." *Id.* at 1145.

Similarly, in *Brayshaw v. Tallahassee,* 709 F. Supp. 2d 1244 (N.D. Fla. 2010), the court struck down as facially unconstitutional a statute that prohibited publishing the "residence address or telephone number" of a law enforcement officer "with the intent to intimidate, hinder, or interrupt any law enforcement officer." *Id.* at 1247–48. "[P]ublication of truthful personal information about police officers," the court concluded, "is linked to the issue of police accountability through aiding in achieving service of process, researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue." *Id.*

We understand the discomfort that citizens, whether public officials or otherwise, feel when someone else posts their personal data online. To be sure, Publius' speech is not the kind of speech that members of polite society would ever engage in or be comfortable having deployed against them.[5] But the Supreme Court has long rejected any notion that decorum is the standard for protection under the First Amendment. The "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" means that First Amendment protects "vehement, caustic, and . . . unpleasantly sharp attacks on . . . public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). And cases such as *Florida Star*, *Ostergren*, *Sheehan*, and *Brayshaw* make clear that the government cannot prevent some citizens' discomfort by suppressing the private speech of other citizens that republishes publicly available information.

**B. Applying § 6254.21(c) To Out-Of-State Actors Violates the Commerce Clause.**

Applying § 6254.21(c) to out-of-state actors like Hoskins also violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. "[T]he 'Commerce Clause . . . precludes the application of a

[5] Indeed, in 1968, members of polite society would never have dreamed of parading around the Los Angeles County courthouse in a jacket that said "Fuck the draft." *Cohen v. California*, 403 U.S. 15 (1971). Nor would they attend funerals of military service members with signs that say "God Hates Fags." *Snyder v. Phelps*, 562 U.S. 443 (2011). Or publicly burn an American flag. *Texas v. Johnson*, 491 U.S. 397 (1989).

state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality op.)). The operation of an online forum is a type of "commerce," regardless of whether money changes hands. *E.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (treating Internet communications as commerce).

Hoskins is a New Hampshire resident, and operates an online forum that focuses primarily on New England. Yet the Legislative Counsel has demanded that Hoskins remove a post from the forum, and that he "continue to ensure that [the legislators' contact information] is not reposted" on the forum or any other website maintained by him. Such state restrictions on speech that occurs wholly outside a state's borders have been repeatedly held to violate the Commerce Clause. Indeed, were the law otherwise, online speakers would be potentially subject to the inconsistent regulations of 50 states.

Thus, for instance, in *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102–04 (2d Cir. 2003), *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239–40 (4th Cir. 2004), *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1160–63 (10th Cir. 1999), and *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168–83 (S.D.N.Y. 1997), federal courts struck down state regulation of online speech that was seen as "harmful to minors." In *Center for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 662–63 (E.D. Pa. 2004), a federal court struck down a state regulation of online speech that was aimed at preventing the distribution of child pornography.

Such laws, the courts concluded, impermissibly applied one state's law to speech in other states. "Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *Dean*, 342 F.3d at 103 (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989)). "The content of the Internet is analogous to the content of the night sky. One state simply cannot block a constellation from the view of its own citizens without blocking or affecting the view of the citizens of other states." *PSINet, Inc.*, 362 F.3d at 240. Such extraterritorial state regulation of the Internet "runs afoul of the dormant Commerce Clause because the Clause 'protects against

inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.'" *Dean*, 342 F.3d at 104 (quoting *Healy*, 491 U.S. at 337).

In all those cases, like in this one, a state was genuinely trying to protect state residents from potential harms that flowed from Internet speech. Yet, like in this case, the application of the state law would necessarily restrict speech in other states—for instance, speech by some New Hampshire residents to other New Hampshire residents on a web site hosted in New Hampshire. Such "project[ing a state's] legislation into other States" is as unconstitutional here as it was in the cases cited above.

**C. Applying § 6254.21(c) To Hoskins And Other Computer Service Providers Violates 47 U.S.C. § 230**

Defendant's attempt to require Hoskins to take down the comment by user "headednorth," and to police similar user comments in the future, is inconsistent with 47 U.S.C. § 230. "No provider or user of an interactive computer service," § 230(c)(1) states, "shall be treated as the publisher or speaker of any information provided by another information content provider." This "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (footnote omitted). Hoskins' Northeastshooters forum is an "interactive computer service," through which users (*i.e.*, "information content provider[s]," 47 U.S.C. § 230(f)(3)) can freely post information on the site. Section 230(c)(1) thus bars Hoskins from being responsible for content posted by third parties.

"[S]ection 230(c)(1) precludes liability that treats a website as the publisher or speaker of information users provide on the website. In general, this section protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016). By requiring Hoskins to remove the legislators' contact information from the site, and imposing an ongoing obligation to monitor the forum and ensure the information is not reposted during the next four years, § 6254.21(c) "treat[s] [Hoskins] as the publisher or speaker" of third-party content in violation of § 230(c)(1). Section 230 thus bars the state from imposing any liability on Hoskins based on what his users post. *See* 47 U.S.C. § 230(e)(3) ("[N]o liability

may be imposed under any State or local law that is inconsistent with this section.”).

**D. The Remaining Preliminary Injunction Factors Weigh In Plaintiffs' Favor.**

**1. Plaintiffs Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction.**

Plaintiffs have suffered, and continue to suffer, irreparable harm as a result of the Legislative Counsel's actions. “Both [the Ninth Circuit] and the Supreme Court have repeatedly held that ‘[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.’” *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod*, and upholding preliminary injunction in the commercial speech context). “The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as ‘timing is of the essence in politics’ and ‘[a] delay of even a day or two may be intolerable.’” *Klein*, 584 F.3d at 1208 (citations omitted).

Furthermore, the Ninth Circuit has long recognized that constitutional violations in general, and First Amendment violations in particular, “cannot be adequately remedied through damages and therefore generally constitute irreparable harm.’” *See, e.g.*, *Stormans, Inc. v. Stelecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted); *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).

**2. The Balance Of Equities Tips In Plaintiffs' Favor.**

“The fact that a case raises serious First Amendment questions compels a finding that there exists ‘the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [claimants'] favor.’” *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002). California, on the other hand, would not be harmed by an injunction. The State “can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional limit on political speech preventing it from enforcing an unconstitutional statute.” *Sanders Cnty. Republican Cent. Comm.*, 698 F.3d at 749; *see also, e.g.*, *Legend Night Club*, 637 F.3d at 302–03; *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388–89 (3d Cir. 2012).

**3. A Preliminary Injunction Is In The Public Interest.**

The Ninth Circuit has "consistently recognized the 'significant public interest' in upholding free speech principles, as the 'ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of plaintiffs, but also the interests of other people' subjected to the same restrictions." *Klein*, 584 F.3d at 1208 (quoting *Sammartano*, 303 F.3d at 974). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks and citation omitted).

Conversely, enforcement of an unconstitutional law is against the public interest. "[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *see also ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) ("[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.") (citation and international quotation marks omitted).

## IV. CONCLUSION

For these reasons, the Court should issue a preliminary injunction that prevents any further action by the Legislative Counsel of California to suppress or punish Plaintiffs' protected speech pursuant to Section 6254.21(c).

Dated: December 15, 2016

By /s Eugene Volokh
EUGENE VOLOKH
Attorneys for Plaintiffs

BENBROOK LAW GROUP, PC

By /s Bradley A. Benbrook
BRADLEY A. BENBROOK
Attorneys for Plaintiffs