EUGENE VOLOKH (SBN 194464)
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone: (310) 206-3926
Facsimile: (310) 206-7010
eugene.volokh@gmail.com

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 1610
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOE PUBLIUS and DEREK HOSKINS,<br><br>Plaintiffs,<br><br>v.<br><br>DIANE F. BOYER-VINE, in her official capacity as Legislative Counsel of California,<br><br>Defendant. | Case No.: 1:16-CV-01152-LJO-SKO<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: Feb. 6, 2017<br>Hearing Time: 8:30 a.m.<br>Judge: Hon. Lawrence J. O'Neill<br>Courtroom 4, Seventh Floor<br>Action Filed: Aug. 5, 2016 |

# REPLY MEMORANDUM

## 1. Defendant Cannot Avoid The Merits By Resorting To Jurisdictional Arguments.

### A. The Office of Legislative Counsel Acted Under Color Of State Law When She Issued Takedown Demands To Private Parties.

Section 6254.21(c)(1)(D)(i) expressly mandates that anyone who receives a takedown demand "shall remove" speech from its Internet site, and "shall continue" to keep it off that site. The Office of Legislative Counsel's demand letters expressly demanded such censorship:

> My office represents the California State Legislature. . . .
>
> This letter constitutes a written *demand* under subdivision (c) of Section 6254.21 . . . . that you remove these home addresses from public display on that Web site, and to take steps to ensure that these home addresses are not reposted on that Web site . . .
>
> *To comply with the law*, please remove the home addresses of these elected officials from your Web site no later than 48 hours after your receipt of this letter . . . . *You are also required* to continue to ensure that this information is not reposted on that Web site . . . or any other Web site maintained by you . . . . [¶] . . . . If these home addresses are not removed from this Web site in a timely manner, we reserve the right to file an action seeking injunctive relief, as well as associated court *costs and attorney's fees* (para. (2), subd. (c), Sec. 6254.21, Gov. C.).

Publius Decl., ¶ 6, & Ex. B (emphasis added). The "we" in "we reserve the right to file an action" was the Office of Legislative Counsel (labeled the "Legislative Counsel Bureau" in the signature block), which "represents the California State Legislature."

This is not a "request" (as the opposition characterizes it, Opp. *passim*). It is not a private litigant threatening a private lawsuit. It is a state actor "demand[ing]" that speech be removed, citing a statute that demands such removal, and threatening speakers with liability for attorney fees for those who do not submit (liability that could easily reach tens of thousands of dollars).

The Office argues that Plaintiffs have not shown that it acted under color of state law. "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law," *West v. Atkins*, 487 U.S. 42, 49–50 (1988) (citations omitted)—*i.e.*, while "acting, purporting, or pretending to act in the performance of his or her official duties." *McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000). The Office sent the letter relying on its power and authority as a state body, power expressly given it by § 6254.21(c)(3). Whatever letters legislators might have been able to send in their individual capacities, the letters

that suppressed Plaintiffs' speech were deliberately sent by an "office [that] represents the California State Legislature," Publius Decl., ¶ 6, & Ex. B—likely precisely because demand letters sent by an official body tend to be especially effective at getting recipients to comply.

Indeed, *Gritchen v. Collier*, 254 F.3d 807 (9th Cir. 2001), the case on which the Office relies, stressed that it did not involve "a private actor act[ing] jointly with state officials to enforce a state statute," but rather considered a police officer "acting entirely by himself, without assistance from state officials." *Id.* at 813–14. And *Gritchen* cited *Lugar v. Edmondson Oil Co.*, which stated that "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment," 457 U.S. 922, 931 (1982), and *Sable Communications v. Pac. Tel. & Tel. Co.*, which stated that a "section 1983 action will lie" if private actors "acted jointly with, or under compulsion from, state officials under a procedural scheme created by the state," 890 F.2d 184, 189 (9th Cir. 1989). This case thus involves precisely the circumstances that *Gritchen* was trying to distinguish.[1]

**B.    Both Plaintiffs Have Standing.**

Standing requirements are relaxed in First Amendment cases. First Amendment law has "endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted). "Were it otherwise, 'free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser.'" *Az. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citation omitted). Likewise, the "threat of potential enforcement" suffices to confer standing in this case. *See, e.g., Protectmarriage.com–Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014); *Getman*, 328 F.3d at 1095 (explaining that self-censorship confers standing when a plaintiff's intended speech "arguably falls within the statute's reach").

---

[1] Substantively, the statute in *Gritchen*, which slightly limited a statutory immunity to a familiar defamation tort claim, differs sharply from Section 6254.21, which creates a new cause of action available only to government officeholders. But in any event, the fact that here the demand came from the Office acting in an official capacity, rather than (as in *Gritchen*) an individual police officer acting in a private capacity, makes *Gritchen* inapplicable by its own terms.

"At the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact," "an injury or threat of injury that is credible." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). The Office has directly enforced Section 6254.21(c) against Plaintiffs, who have refrained from reposting the legislators' contact information because of the Office's takedown demands. This simple point establishes standing. (Indeed, Plaintiffs would have standing even if this were a pre-enforcement challenge: They have "show[n] a reasonable likelihood that the government will enforce the challenged law against them," they have shown a concrete plan to violate the law, and the law indeed applies to their planned conduct. *See Lopez*, 630 F.3d at 786.)

<u>*Publius*</u>. Defendant claims that Publius lacks standing because it is "plausible" that WordPress deactivated the blog post because the post supposedly violated the WordPress User Guidelines. Thus, the opposition claims, "it is purely speculative whether the removal of [Publius's] blog post is fairly traceable to the 'encouragement' of section 6254.21" itself. Opp. 12:16–17. Yet there is no need to speculate: The WordPress "community guardian" informed Publius that the blog post was removed because, "[u]nder subdivision (c) of Section 6254.21 of the Government Code, an authorized representative from the state of California has demanded that we disable the following content on your WordPress.com site." Publius Decl. Ex. B.[2] But in any event, any purported "factual question of [WordPress's] true motivations is immaterial." *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1297 (9th Cir. 1987). "Simply by 'command[ing] a particular result,' the state ha[s] so involved itself that it [cannot] claim the conduct . . . actually occurred as a result of private choice." 827 F.2d at 1295 (quoting *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963)). "The mere fact that [a private actor] might have been willing to act without coercion makes no difference if the government did coerce." *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989).

---

[2] Nor is it "plausible" that WordPress would have determined that the post violated the User Guidelines attached to the Woocher Declaration (Ex. 13). The post was not "directly threatening," and it did not disclose "private information," for the reasons given in the opening brief. *Cf. id.* ("direct threat" guideline means "you cannot post a genuine call for violence—or death—against an individual," and "[t]his doesn't mean we'll remove all hyperbole or offensive language").

More broadly, the government may not threaten intermediaries—service providers, bookstores, movie theaters, or anyone else—because they allowed speech that the government forbids, and then hide behind the claim that the intermediaries' removal of the speech was their own choice. The Supreme Court made this clear in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), where it held unconstitutional a Rhode Island state commission's sending letters to bookstores threatening them with obscenity prosecution if they sold plaintiffs' works. The bookstores, the Court said, had standing to challenge the Commission: "the direct and obviously intended result of the Commission's activities was to curtail the circulation . . . of books published by appellants." *Id.* at 64 n.6. The Commission's threatening letters were "a form of effective state regulation," because they pressured intermediaries into complying while "eliminat[ing] the safeguards of the criminal process." *Id.* at 69–70. "People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* at 68.

The same reasoning applies when the letters are sent to an Internet hosting platform rather than a bookseller. The threat was of civil liability in the form of attorney fees—which can quickly mount into the tens of thousands of dollars—rather than criminal prosecution. But First Amendment protections apply to the threat of financial loss through the civil process just as they do to the threat of fines or jail time through the criminal process. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964); *Carlin Communications*, 827 F.2d at 1295 (county attorney's direction that phone company terminate a customer's service, accompanied by threat of litigation, violated the First Amendment). *Simon v. East Ky. Welfare Rights Org.*, 426 U.S. 26 (1976), and *Pritikin v. Dep't of Energy*, 254 F.3d 791 (9th Cir. 2001), cited at Opp. 12, are thus not on point: WordPress' action is indeed "fairly traceable" to Defendant's conduct—the Office specifically demanded that WordPress take action against Publius, and threatened litigation if WordPress failed to act.

Nor can the Office escape this by claiming (as it does elsewhere in the opposition, Opp. 22) that WordPress must have known that Section 6254.21(e) immunizes it from attorney fees. That subsection only exempts sites from being held "liable," but the Office itself asserts that the attorney fee award is not a form of "liability." *See* Opp. 19 n.15; *infra* Part 2.C, p. 9. Even if this Court rejects the Office's assertion, as Plaintiffs think it should, the Office's making this assertion

shows how perilous it would have been for WordPress to ignore the Office's demand letter.

The Office is likewise wrong to argue that a favorable decision could not benefit Publius. Publius' injury stems from the Office's actions and the threat of further enforcement. When "the plaintiff is himself an object of the [government] action," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Speculating that WordPress *might* on its own block the speech does not change the result. A victory would free Publius to repost the contact information—whether on a WordPress blog or elsewhere—without fear of violating the statute and facing a future lawsuit by the Office.

*Hoskins*. The Office claims that Hoskins' free speech rights were not violated because the censored content was posted not by him, but by a forum user, and Hoskins was "merely provid[ing] a forum" for such speech. Opp. 13–14. But the Supreme Court has long held that booksellers, movie theaters, parade organizers, and others who are not publishers of speech still have a First Amendment to distribute whatever speech they choose to distribute. *See, e.g.*, *Smith v. California*, 361 U.S. 147 (1959) (booksellers); *Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980) (movie theaters); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) (parade organizers). Like a bookseller or theater operator, Hoskins has a First Amendment right to distribute or display others' material. Were it not for Section 6254.21(c) and the Office's demand, Hoskins would not have removed the post, and would not take any effort to ensure that the information is not reposted. Hoskins Decl. ¶ 5. A favorable ruling in this case would vindicate his right to include posts of his choosing on his forum.

**2.    Plaintiffs Are Likely to Prevail on The Merits.**

**A.    Plaintiffs Should Prevail on Their First Amendment Claims.**

The Office of Legislative Counsel does not discuss—indeed, does not even cite—*Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W.D. Wash. 2003), and *Brayshaw v. Tallahassee*, 709 F. Supp. 2d 1244 (N.D. Fla. 2010), two cases that struck down very similar statutes to this one. *See* Memo. 15–16. Nor does it cite *Bartnicki v. Vopper*, 532 U.S. 514 (2001), which upheld the right to republishing even information (there, an intercepted cell phone conversation) that had been *illegally ob-*

*tained* by the person who forwarded it to the speaker.  *See* Memo. 10.

The Office does assert that the speech in this case contains information that was not derived from government records, but from publicly available commercial records.  *See* Memo. 17–18.  But that would not distinguish this case from *Bartnicki*; and in any event, many of the commercial records were themselves compiled from public records, such as property records.  Publius Decl., ¶ 4; *see also* Woocher Decl., Ex. 5, at 3 ("[u]nder current law, in order to buy a home, get married, or vote, a public safety official must disclose his or her home address and other private information with the knowledge that it may be disclosed and that property ownership information can be sold or released to private companies").  Nor does the Freedom of Information Act case cited by the government, *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 764 (1989), bear on the First Amendment issue: *Florida Star v. B.J.F.* makes clear that, even when the government is justified in not releasing information, it cannot punish people for redistributing that information—even in much more easily accessible places (such as newspapers)—once that information is released.  491 U.S. 524, 534 (1989).

The Office also argues that Plaintiffs' speech may not be of "public significance," dismissing Plaintiffs' "hypothetical scenarios in which such information *might be* connected to political advocacy, such as organizing marches on an official's home or verifying the lawfulness of where they live" on the grounds that "none of these were why Publius posted the information on his blog, and thus they cannot serve to support his constitutional challenge in this case." Opp. 17 n.12.

But, first, Publius is using the information as part of a political argument protesting a new California law's collection of citizen address information for an ammunition database; Hoskins likewise wishes to let his users repost this protest. Memo. 5–8.  And, second, overbreadth challenges such as this one are all about considering whether a statute restricts a substantial amount of protected speech, including speech not being engaged in by the particular challengers.  *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 474–80 (2010) (invalidating ban on animal cruelty videos because it covered protected speech that was far removed from the challenger's own speech, and not deciding whether challenger's speech could have been restricted under a narrower law).

///

The Office also suggests that Plaintiffs' speech has caused some people to call legislators at their residences, and send "threatening social media messages" related to the legislators' addresses. Opp. 7. Those who post actual threats may themselves be punished (though the Office does not argue that Publius' speech satisfies the "true threat" standards). But speech conveying accurate information cannot be punished just because a tiny fraction of readers may use the information improperly. Indeed, *Organization for Better Austin v. Keefe* struck down an injunction against leafletters even when, unlike here, two leaflets had affirmatively "requested recipients to call respondent at his home phone number and urge him to [comply with the leafletters'] demands." 402 U.S. 415, 417 (1971). Likewise, in *NAACP v. Claiborne Hardware Co.*, activists had distributed the names of black Claiborne County residents who refused to comply with a boycott of white-owned stores, and there were several incidents of outright violent attacks on such noncomplying residents. 458 U.S. 886, 904–06 (1982). Claiborne County at the time had only 7500 black residents, U.S. Dep't of Commerce, *County and City Data Book* 1972, at 258, so publishing residents' names in a local black newspaper and reading the names at a local black churches, 458 U.S. at 909, was tantamount to publishing their addresses. Yet the Court reversed a civil damages award imposed on the speakers, despite the injury that their speech may have caused. *Id*. at 934.

Finally, the Office argues that "[p]laintiffs are . . . incorrect in asserting that California law *requires* home address information for all voters to be made available," and that "California does indeed have 'a general policy of keeping people's home addresses confidential.'" Opp. 18 n.14. The Office's evidence for this is that various statutes limit the use of this information to "election and governmental purposes." *Id.* But distributing material to anyone who seeks it for "election . . . purposes" is hardly keeping it "confidential"; rather, it *is* a requirement that the information "be made available." Indeed, in *Florida Star v. B.J.F.*, the case that the Office is trying to distinguish, the report containing a rape victim's name was "posted in a room that contained signs making it clear that the names of rape victims were not matters of public record, and were not to be published." 491 U.S. at 546 (1989) (White, J., dissenting). Yet despite that, the Court concluded that republishing this information could not lead to liability. Even more clearly, republishing information that is much more widely distributed is protected by the First Amendment. And of course

Section 6254.21 bars its targets from republishing the information even when they do so for "election . . . purposes," thus further showing that Section 6254.21 is overbroad.

### B. Plaintiffs Should Prevail on Their Commerce Clause Claims.

Section 6254.21 tries to impose the California Legislature's will on speech throughout the nation. *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989), makes clear that this violates the Commerce Clause, and many circuit and district court cases have applied this principle to invalidate such state regulations of Internet speech. *See* Memo. 17–18. The Office claims that *Healy* "has been limited by the Supreme Court in subsequent years to the factual context of that case: 'price control or price affirmation statutes" that involve "tying the price of . . . in-state products to out-of-state prices,'" citing *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). But *Pharm. Research & Mfrs.* simply held that, when a statute "'does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect,'" *id.* (citation omitted), the statute does not regulate extraterritorial behavior, and *Healy* thus does not apply. Here, § 6254.21 *does* expressly regulate the contents of out-of-state communications; indeed, that is the very premise of the Office's letter to plaintiff Hoskins. [Should we discuss the other cases that Leg. Counsel cites?]

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 433 (9th Cir. 2014), the one Internet speech Commerce Clause case on which the Office relies, shows the weakness of the Office's argument. In that case, the Ninth Circuit rejected a Commerce Clause argument against a California regulation that required CNN to provide closed captioning for programming served online to California residents. The Ninth Circuit's analysis rested on one argument: "Even though CNN.com is a single website, the record before us shows that CNN could enable a captioning option for California visitors to its site, leave the remainder unchanged, and thereby avoid the potential for extraterritorial application of the DPA." *Id.* at 21.

Nothing in the record shows that Hoskins could selectively block California residents alone from having access to those NortheastShooters.com posts that violate Section 6254.21, "leav[ing] the remainder unchanged." Such post-by-post geographic blocking is not a standard option available to people such as Hoskins, who use off-the-shelf discussion board sites (as opposed to sophisticated multibillion-dollar media businesses such as CNN). And in any event, this would not "avoid

the potential for extraterritorial application" of Section 6254.21, since the statutory commands require Hoskins to remove material altogether, not just conceal it from California readers.

### C. Plaintiffs Should Prevail on Their 47 U.S.C. § 230 Claims.

The Office argues that web site operators have nothing to fear from Section 6254.21, Opp. 22—and yet the letter it sent to Hoskins demanded that he take down speech in order to "comply with the law." Moreover, though Section 6254.21(e) only immunizes service providers from being held "liable," the Office denies that attorney fee awards are even a form of "liability," Opp. 19 n.15 (disputing "that section 6254.21(c)(2)'s mandatory costs and attorney's fees award constitutes the imposition of 'automatic liability'").

The Office's argument about the scope of 6254.21(e) is mistaken. Liability is indeed "automatic": Section 6254.21(c)(2) says "If a court finds that a violation has occurred, it may grant injunctive or declarative relief and *shall* award the official court costs and reasonable attorney's fees." (emphasis added). The violation is reposting the content after receiving a demand letter—such reposting thus results in automatic liability for attorney's fees. And it is indeed "liability," contrary to the Office's odd claim that the fees are just "costs" rather than "damages." Liability for attorney fees is still liability, even if its goal is, as the Office argues, "merely to ensure that the plaintiff will be fully compensated." *New York Times Co. v. Sullivan*, for instance, held that even pure compensatory damages liability was still chilling enough that it was subject to First Amendment scrutiny. 376 U.S. at 262, 265. *See also, e.g.*, *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) (noting that the risk of being assessed attorney fees if they lose may deter people from asserting their rights); *Riddle v. Egensperger*, 266 F.3d 542, 551 (6th Cir. 2001) (noting the "chilling effect" on parties of the "risk of being assessed attorney fees").

But the Office obviously takes a narrower view of "liability" than we do. And this denial that the imposition of attorney fees is "liability" contradicts the Office's argument that Section 6254.21(e) would adequately protect service providers.

Finally, Section 6254.21(e) expressly excludes situations where "the service or provider intends to abet or cause imminent great bodily harm that is likely to occur or threatens to cause imminent great bodily harm to an elected or appointed official"; in those situations, Section 6254.21

would therefore indubitably authorize liability.  Yet 47 U.S.C. § 230 has no such limitation; it secures immunity against all such state-imposed liability, indeed including against injunctions even in the absence of any monetary awards.  *See, e.g.*, *Ben Ezra, Weinstein, & Co. v. America Online Inc.,* 206 F.3d 980, 983–84 (10th Cir. 2000) (holding that § 230 preempted plaintiff's request for "injunctive relief" as well as for damages); *Kathleen R. v. City of Liverpool*, 87 Cal. App. 4th 684, 781 (2001) ("the statute by its terms also precludes other causes of action for other forms of relief [than damages]"); *Giordano v. Romeo*, 76 So. 3d 1100 (Fla. Ct. App. 2011) (holding that web sites "enjoy[] complete immunity" under § 230 both from injunctive relief and damages).  Online threats of violence may be punished by federal criminal law, 18 U.S.C. § 875; 47 U.S.C. § 230(e)(1)—but not by state law.

\* \* \*

The Office's brief argument about the remaining preliminary injunction factors consists mostly of denigrating plaintiffs' speech interests and scaremongering about a "gun-loving madman" who might see these home addresses—never mind, again, that *all* of the addresses are already widely publicly available.  While the Office works hard in the opposition to avoid confronting its weakness on the merits, in First Amendment cases the merits strongly influence the remaining factors. *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009).  As shown in the Office's opposition materials, the chief limitation on protecting public officials' home address information is California's property recording system. Woocher Decl., Ex. 5.  California has multiple means of addressing the important concerns of protecting the safety of its public officials, but so long as the government itself makes this information publicly available, censoring its republication is not a constitutional means of addressing those important safety concerns.

Dated:  January 30, 2017

By /s Eugene Volokh
EUGENE VOLOKH
Attorneys for Plaintiffs

By /s Bradley A. Benbrook
BRADLEY A. BENBROOK
BENBROOK LAW GROUP, PC
Attorneys for Plaintiffs