1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

| | |
|---|---|
| **DOE PUBLIUS and DEREK HOSKINS,** | **1:16-cv-1152-LJO-SKO** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Doc. 19)** |
| **v.** | |
| **DIANE F. BOYER-VINE, in her official capacity as Legislative Counsel of California,** | |
| **Defendant.** | |

11

12

## I. <u>INTRODUCTION</u>

13

14

15

16

17

18

Plaintiffs Doe Publius[1] and Derek Hoskins bring this civil rights case under 42 U.S.C. § 1983 ("§1983"), challenging California Government Code § 6254.21(c) ("§ 6254.21(c)") under the First Amendment, the Commerce Clause, and 47 U.S.C. § 230 ("§ 230"). Plaintiffs move for a preliminary injunction that prevents Defendant Diane F. Boyer-Vine, Legislative Counsel for the Office of Legislative Counsel of California ("the Office"), from enforcing § 6254.21(c) against them. *See* Doc. 19-1 at 26.

19

20

The Court took the matter under submission on the papers pursuant to Local Rule 230(g). Doc. 23. For the following reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion.

21

22

23

24

25

---

[1] Publius brings this suit anonymously under *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000), because he believes doing so is "necessary to preserve [his] First Amendment right to speak anonymously when criticizing the government . . . and to guard against the risk of retaliatory and unfounded prosecution under the criminal provisions of the statutory scheme [he] challenges," specifically, California Government Code § 6254.21(c). Doc. 12, First Amended Complaint ("FAC"), at ¶ 12 n.1. Publius states in the FAC that he intends to file a motion to pursue this case anonymously, but, to date, he has not done so. *Id.* Defendant, however, has not objected to his anonymity.

1

1

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

2

On July 1, 2016, California Governor Jerry Brown signed several gun control bills into law. Doc.

3

12, First Amended Complaint ("FAC"), at ¶ 15. One of those bills established a database tracking all

4

ammunition purchases in California. *See* Cal. Penal Code §§ 30352, 30369. The database includes the

5

driver's license information, residential address and telephone number, and date of birth for anyone who

6

purchases or transfers ammunition in California. *See id.*

7

Publius maintains a political blog under the name, "The Real Write Winger." FAC at ¶ 15. On

8

July 5, 2016, in response to the California legislature's gun control legislation, he posted the following

9

blog entry, titled "Tyrants to be registered with California gun owners":

10
11
> If you're a gun owner in California, the government knows where you live. With the recent anti gun, anti Liberty bills passed by the legisexuals in the State Capitol and signed into law by our senile communist governor, isn't it about time to register these tyrants with gun owners?

12
13
14
15
16
> Compiled below is the names, home addresses, and home phone numbers of all the legislators who decided to make you a criminal if you don't abide by their dictates. "Isn't that dangerous, what if something bad happens to them by making that information public?" First, all this information was already public; it's just now in one convenient location. Second, it's no more dangerous than, say, these tyrants making it possible for free men and women to have government guns pointed at them while they're hauled away to jail and prosecuted for the crime of exercising their rights and Liberty.

17
18
19
> These tyrants are no longer going to be insulated from us. They used their power we entrusted them with to exercise violence against us if we don't give up our rights and Liberty. This common sense tyrant registration addresses this public safety hazard by giving the public the knowledge of who and where these tyrants are in case they wish to use their power for violence again.

20
21
22
> So below is the current tyrant registry. These are the people who voted to send you to prison if you exercise your rights and liberties. This will be a constantly updated list depending on future votes, and if you see a missing address or one that needs updating, please feel free to contact me. And please share this with every California gun owner you know.

23
24
> To be fair, the only way for a tyrant to have their name removed from the tyrant registry is to pass laws which repeal the laws that got them added to the list, or upon the tyrant's death. Otherwise, it is a permanent list, even after the tyrant leaves office. The people will retain this information and have access to it indefinitely.

25

FAC at ¶ 17. Through searching public records for free on zabasearch.com[2], Publius compiled the names, home addresses, and phone numbers of 40 California legislature members who had voted in favor of the gun control measures. *Id.* at ¶¶ 17-18. He then posted that information on his blog. *Id.* at ¶ 17.

In the days that followed, several legislators received threatening phone calls and social media messages that appeared to have been prompted by Publius's blog entry. Doc. 21, Declaration of Frederic Woocher ("Woocher Decl."), at ¶ 2. Specifically,

> there were reports from at least four different State Senators that either they or one of their family members had received a phone call at their residence from an unidentified male speaker saying, "I know your address and don't you wish you knew who I am?" One of the calls was received by the step-son of a Senator who was alone in the home while the Senator and his wife were away. At least two other Senators had reported receiving (and forwarded to the [California Senate] Sergeant-at-Arms) threatening social media messages; one warned: "You have no right to pass laws to take my constitutional rights away. (2nd & 1st amendments) Let alone pass a bill that makes you exempt from the very same laws. I've have [sic] shared your home address in the Internet. The People will be acting on this."

*Id.*

The Senate Sergeant-at-Arms sent the Office "a request to seek the removal of the legislators' home addresses from the internet pursuant to section 6254.21(c)." Doc. 20 at 13. In response, on July 8, 2016, Deputy Legislative Counsel Kathryn Londenberg sent a written demand to WordPress.com, who hosted Plaintiff's blog. FAC at ¶ 19. The demand stated:

> To whom it may concern:
>
> My office represents the California State Legislature. It has come to our attention that the home addresses of 14 Senators and 26 Assembly Members have been publically posted on an Internet Web site hosted by you without the permission of these elected officials. Specifically, the user on your platform by the name of

---

[2] Defendant describes zabasearch as "a commercial vendor," and therefore contends Publius "did not obtain the legislators' addresses from public records."Doc. 20 at 24-25. But, according to zabasearch.com, "[a]ll information found using ZabaSearch comes from public records databases. That means information collected by the government, such as court records, country records, state records, such as the kind of information that becomes public when you buy a new house or file a change-of-address form with the United States Postal Service." *See* www.zabasearch.com/faq (last visited February 7, 2017). Defendant therefore does not dispute that the legislators' personal information Publius posted was publicly available.

1    "therealwritewinger" posted the home addresses of these elected officials on his or
     her Web site . . . .

2

3    This letter constitutes a written demand under subdivision (c) of Section 6254.21 of
     the Government Code that you remove these home addresses from public display
     on that Web site, and to take steps to ensure that these home addresses are not

4    reposted on that Web site, a subsidiary Web site, or any other Web site maintained
     or administered by WordPress.com or over which WordPress.com exercises

5    control. Publicly displaying elected officials' home addresses on the Internet
     represents a grave risk to the safety of these elected officials.

6

7    On the "therealwritewinger" blog site, the user describes the listed legislators as
     "tyrants," encourages readers to share the legislators' home addresses with other gun
     owners, and threatens that the home addresses will not be removed unless the legislator

8    repeals specified gun laws or "upon the tyrant's death." The Senators and Assembly
     Members whose home addresses are listed on this Web site fear that the public

9    display of their addresses on the Internet will subject them to threats and acts of
     violence at their homes.

10

11   To comply with the law, please remove the home addresses of these elected
     officials from your Web site no later than 48 hours after your receipt of this letter
     (cl. (i), subpara. (D), para. (1), subd. (c), Sec. 6254.21, Gov. C.). You are also

12   required to continue to ensure that this information is not reposted on that Web site,
     any subsidiary Web site, or any other Web site maintained by you (subpara. (D),

13   para. (1), subd. (c), Sec. 6254.21, Gov. C.).

14   . . . . If these home addresses are not removed from this Web site in a timely
     manner, we reserve the right to file an action seeking injunctive relief, as well as

15   associated court costs and attorney's fees (para. (2), subd. (c), Sec. 6254.21, Gov.
     C.).

16

17   *Id.* WordPress immediately removed Publius's entire blog entry. *Id.* at ¶ 20. Publius requested a copy of

18   the demand from WordPress. Doc. 12-2 at 1. WordPress forwarded the letter, explaining that "[u]nder

19   subdivision (c) of Section 6254.21 of the Government Code, an authorized representative from the state

20   of California ha[d] demanded that we disable" Publius's blog entry. *Id.*

21       Hoskins, a resident of Massachusetts, *id.* at ¶ 13[3] owns and moderates the website

22   Northeastshooters.com, "a popular New England online forum for discussing firearms issues and

23   shooting sports activities." *Id.* at ¶ 21. On July 11, 2016, Northeastshooters.com users began a

24   _____

25   [3] In the FAC, Plaintiffs allege Hoskins is a resident of Massachusetts, but in their moving papers they claim he is a resident of
     New Hampshire. *See, e.g.*, Doc. 19-1 at 23. His residency is relevant only insofar as he challenges § 6254.21(c)'s reach
     beyond California, so the analysis of his claims is the same whether he is a resident of Massachusetts or New Hampshire.

4

1    discussion about the Legislative Counsel's takedown demand to WordPress concerning Publius's blog

2    entry. *Id.* at ¶ 22. One commenter, under the name "headednorth," reposted Publius's compiled list of

3    names, addresses, and home addresses of the California legislators. *Id.* at ¶ 23. Legislative Counsel

4    Londenberg immediately emailed Hoskins, noted that headednorth had reposted the legislators' personal

5    information removed from Publius's blog on Northeastshooters.com, and demanded that Hoskins

6    remove it immediately via a takedown demand that was "materially identical" to the one sent to

7    WordPress. *Id.* at ¶ 24. Hoskins complied. *Id.* at ¶ 5.

8            Plaintiffs seek a declaratory judgment from the Court that § 6254.21(c) violates (1) the First

9    Amendment both facially and as applied to both of them; (2) the Commerce Clause, U.S. Const., art. I, §

10   8, cl. 3, as applied to Hoskins's out-of-state speech; and (3) § 230 as to Hoskins and other computer

11   service providers. FAC at 16. Plaintiffs currently seek a preliminary injunction on these grounds, and

12   ask the Court to enjoin Defendant from "enforcing or applying" § 6254.21(c) against them. Doc. 19 at 2.

13   Defendant argues, among other things, that: (1) Plaintiffs lack standing; (2) Plaintiffs fail to state a claim

14   under § 1983; and (3) the statute is entirely lawful. Doc. 20 at 8.

15                              **III. <u>STANDARD OF DECISION</u>**

16          To secure injunctive relief prior to a full adjudication on the merits, a plaintiff must show "that

17   he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

18   preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

19   interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an

20   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

21   relief." *Id.* at 22. The Ninth Circuit follows a "sliding scale" approach to preliminary injunctions. *See*

22   *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Under this approach, the

23   elements of the preliminary injunction test are balanced, so that a stronger showing of one element may

24   offset a weaker showing of another." *Id.* at 1131-32. For example, if the moving party is unable to

25   establish a likelihood of success on the merits, preliminary injunctive relief may still be proper if the

5

1  party can show that (1) there are at least "serious questions" going to the merits; (2) the balance of the

2  hardships tips "sharply" in its favor; and (3) the other factors listed in *Winter* (*i.e.*, irreparable harm and

3  in the public interest) are satisfied. *Id.* at 1135.

## IV. ANALYSIS

**A.  Plaintiffs have standing**

    **1.  Standing principles**

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing. *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990); *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002).

Generally, to have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted). First Amendment cases, however, "present unique standing considerations." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "In an effort to avoid the chilling effect

1  of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and

2  challenge now' approach rather than requiring litigants to speak first and take their chances with the

3  consequences" *Id.* (citations omitted). "[A]s the Supreme Court has recognized, a chilling of the exercise

4  of First Amendment rights is, itself, a constitutionally sufficient injury." *Id.* Accordingly, "the Supreme

5  Court has dispensed with rigid standing requirements [in First Amendment cases] and recognized 'self-

6  censorship' as a harm that can be realized even without an actual prosecution." *Human Life of Wash.,*

7  *Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010).[4] "[W]here a plaintiff has refrained from

8  engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship

9  is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the

10 challenged statute will be enforced." *Id.* at 1001 (quotation marks omitted).  Thus, "when the threatened

11 enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of

12 standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

13     First Amendment challenges may be brought as "facial" or "as-applied" challenges. *See Santa*

14 *Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir. 2006). The Ninth

15 Circuit succinctly described the challenges as follows:

16          Facial constitutional challenges come in two varieties: First, a plaintiff seeking to
           vindicate his own constitutional rights may argue that an ordinance is unconstitutionally
17          vague or . . . impermissibly restricts a protected activity. Second, an individual whose
           own speech or expressive conduct may validly be prohibited or sanctioned is permitted to
18          challenge a statute on its face because it also threatens others not before the court. The
           former sort of challenge . . . may be paired with the more common as-applied challenge,
19          where a plaintiff argues that the law is unconstitutional as applied to his own speech or
           expressive conduct.
20

21 *Id.* at 1033-34 (citations and quotation marks omitted). "It is within this framework that [Plaintiffs] . . .

22 must establish standing." *Id.* at 1034.

23

24 _____

25 [4] Self-censorship for fear of civil liability may be a sufficient injury for standing purposes. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

### 2.    Analysis

Defendant contends Plaintiffs cannot demonstrate that Defendant caused them to suffer any injury that could be favorably addressed by the Court. As to Publius, the thrust of Defendant's position is that it is "quite plausible, if not probable" that WordPress removed Publius's blog entry on its own accord because it violated WordPress's terms of service and, in any event, Plaintiffs have not presented any evidence that WordPress would permit the blog entry even if Defendant never invoked § 6254.21(c) or if the Court found the statute unlawful. *See* Doc. 20 at 18-19. As to Hoskins, Defendant concedes (and the Court agrees) that "there is no issue regarding the causation and redressability prongs of the constitutional standing requirements," but argues that Hoskins did not suffer any injury. *Id.* at 19. Instead, Defendants argue that only the user of his site, "headednorth," whose post Hoskins removed, suffered any asserted injury. *Id.*

That Hoskins did not produce the content contained in headednorth's removed post does not mean he did not and cannot suffer a First Amendment injury. As the owner of Northeastshooters.com, Hoskins has a First Amendment right to distribute and facilitate protected speech on the site. *See Smith v. California*, 361 U.S. 147 (1959) (striking down statute imposing strict liability on a seller of obscene books as violating First Amendment); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 497 (1952) (striking down statute prohibiting movie producer's distribution of movie); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 59-61 (1963) (holding book distributors had standing to challenge law restricting the sale of certain books). The mere threat of prosecution under a challenged statute that results in actual self-censorship constitutes "a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Human Life*, 624 F.3d at 1001. Defendant's takedown demand letter threatening legal action against Hoskins if he did not immediately comply and remove headednorth's post, coupled with Hoskins's compliance with the demand, constitutes a cognizable constitutional injury. *See id.*; *Bayless*, 320 F.3d at 1006 (finding that plaintiff, who was "forced to modify its speech and behavior to comply with the statute," had suffered sufficient injury

1    even though it had "neither violated the statute nor been subject to penalties for doing so").[5] The Court

2    therefore finds that Hoskins has standing to challenge § 6254.21(c) both on its face and as-applied to

3    him.

4          Defendant does not dispute that Publius suffered a constitutional injury, but disputes whether the

5    Office caused his asserted injury and whether the Court could redress it favorably. Defendant essentially

6    argues that there is no evidence that WordPress removed Publius's blog post as a result of the Office's

7    demand letter, and that it is plausible that WordPress did so on its own accord because the post violated

8    WordPress's terms of service. Thus, Defendant claims, it is plausible that WordPress would remove the

9    post regardless of the Court's decision.

10         The only evidence concerning WordPress's motivation in removing Publius's blog entry does

11   not support Defendant's position. As explained above, WordPress removed the blog post immediately

12   after the Office sent the takedown demand. Publius, somehow cognizant of the Office's demand,

13   requested a copy of it. WordPress forwarded the Office's demand to Publius, and explained that

14   "[u]nder subdivision (c) of Section 6254.21 of the Government Code, an authorized representative from

15   the state of California has demanded that we disable [your blog entry]." Doc. 19-2 at 13. WordPress

16   provided no other explanation for its removing the blog entry. On the current record, Defendant's

17   assertion that WordPress removed the entry because it violated the site's terms of service is entirely

18   speculative, not "quite plausible, if not probable." Doc. 20 at 18. Likewise, because the only evidence

19   (direct and circumstantial) submitted suggests that WordPress removed the blog post because of the

---

[5] In any event, Defendant seemingly does not dispute that headednorth would have standing to challenge § 6254.21(c) under the First Amendment. *See* Doc. 20 at 19. Though Plaintiffs do not make the argument, Hoskins, as the owner and operator of Northeastshooters.com, has third-party standing to assert the First Amendment rights of its anonymous users, such as headednorth. *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 785 (M.D. Pa. 2008) (holding as matter of first impression that website owner may assert First Amendment rights of third-party anonymous users of its site); *McVicker v. King*, 266 F.R.D. 92, 95-96 (W.D. Pa. 2010) (relying on *Enterline* and holding the same); *In re Drasin*, No. ELH-13-1140, 2013 WL 3866777, at *2 n.1 (D. Md. July 24, 2013) (same); *In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244, 257-58 (D.D.C. 2003) (holding that Verizon had standing to assert First Amendment rights of its customers), *rev'd on other grounds*, 351 F.3d 1229, 1239 (D.C. Cir. 2003) *see also Trawinski v. Doe*, No. L-8026-12, 2015 WL 3476553, *4-5 (N.J. Super. Ct. App. Div. June 2, 2015) (applying First Amendment standing principles); *Indiana Newspapers, Inc. v. Miller*, 980 N.E.2d 852, 858-59 (Ind. 2012) (same).

1    Office's takedown demand, it is plausible that it would not have been removed but for the demand.

2            Further, Publius does not simply claim his asserted First Amendment right is to post as he sees fit

3    on WordPress alone, as Defendant suggests. Publius challenges § 6254.21(c)'s prohibition on his ability

4    to repost the legislators' personal information anywhere online—or "through any other medium." §

5    6254.21(c)(1)(D)(ii). Although this case does not present the Court with any jurisdiction to control the

6    content on WordPress, a private entity, the Court does have the authority (and obligation) to determine

7    whether legislation violates the First Amendment. The Court's finding that § 6254.21(c) does so would

8    redress Publius's asserted injury. Accordingly, the Court finds that Publius has standing to challenge

9    § 6254.21(c).

10   **B.    Defendant's conduct was under color of law**

11           "To state a claim for relief under section 1983, the Plaintiffs must plead two essential elements:

12   1) that the Defendant[] acted under color of state law; and 2) that the Defendant[] caused them to be

13   deprived of a right secured by the Constitution and laws of the United States." *Johnson v. Knowles*, 113

14   F.3d 1114, 1117 (9th Cir. 1997).[6] Defendant asserts Plaintiffs fail to state a claim under § 1983 because

15   the Office's sending the takedown demand letters was not "under color of law" and, consequently, the

16   Court lacks jurisdiction over this case. Doc. 20 at 20-21; *West v. Atkins*, 487 U.S. 42, 46 (1988) (holding

17   that acting under color of state law is "a jurisdictional requisite for a § 1983 action"). Distilled,

18   Defendant argues that the Office's sending the takedown demand letters to WordPress and Hoskins on

19   behalf of the California legislators was not state action because the legislators were acting as private

20   citizens who made private decisions to threaten private lawsuits if their personal information was not

21

22   _____

23   [6] Although not raised in the briefs, the Court notes that the "Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities." *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007). State official defendants named in their official capacities are subject only to suit "for prospective declaratory and injunctive relief . . . to enjoin an alleged ongoing violation of federal law" under § 1983. *Flint v. Dennison*, 488 F.3d 816, 824-25 (9th Cir. 2007) (citation omitted); *Lacano Investments, LLC v. Balash*, 765 F.3d 1068, 1072 (9th Cir. 2014) ("[The Eleventh Amendment does not bar actions when citizens seek only injunctive or prospective relief against state officials who would have to implement a state law that is allegedly inconsistent with federal law.") (citations omitted).

1   removed. Doc. 20 at 20.

2       "An individual acts under color of state law when he or she exercises power possessed by virtue

3   of state law and made possible only because the wrongdoer is clothed with the authority of state law."

4   *Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015) (citations and quotation marks omitted). "This test is

5   generally satisfied when a state employee . . . wrongs someone while acting in his official capacity or

6   while exercising his responsibilities pursuant to state law." *Id.* (citations and quotation marks omitted).

7       Defendant relies primarily on *Gritchen v. Collier*, 254 F.3d 807 (9th Cir. 2001), and *Laxalt v.

8   McClatchy*, 622 F. Supp. 737 (D. Nev. 1985), for her position that the Office's conduct was not state

9   action. In *Gritchen*, the plaintiff (Gritchen) filed a formal complaint against a police officer, Collier,

10  claiming that Collier "had been discourteous, argumentative, and that his breath smelled like alcohol."

11  254 F.3d at 809. After the police department "found no misconduct," Collier, through his attorney, sent

12  Gritchen a letter threatening to bring suit for defamation under California Civil Code § 47.5, which

13  permits peace officers to bring defamation actions against someone who files a false complaint. *Id.* at

14  809-10. Gritchen then filed a § 1983 suit alleging, among other things, that § 47.5 violates the First

15  Amendment. *Id.* at 810. The Ninth Circuit held that Collier's conduct—threatening to sue Gritchen for

16  defamation under § 47.5—was not "under color of state law" because he acted "entirely by himself,

17  without assistance from state officials." *Id.* at 813-14.

18      In *Laxalt*, the plaintiff (Laxalt), a United States Senator, brought suit against numerous

19  newspapers and their staff for their allegedly defamatory articles. 622 F. Supp. at 739. The defendants

20  counterclaimed against Laxalt under § 1983, arguing that the Senator had violated their First

21  Amendment rights by using his office to chill their speech. *Id.* at 746. The basis for their claims was

22  that, shortly after the defendants published their articles, Laxalt sent them a letter on Senate stationary

23  with his signature demanding the sources for the articles and that they be retracted. *Id.* at 747. The

24  defendants construed the letter as a threat from Laxalt that he would use his office "to retaliate against

25  them if they did not comply." *Id.* The court rejected the defendants' claim, finding that Laxalt "ha[d]

11

1    proceeded, as any other private citizen would have, to clear his name . . . and to recover damages for an

2    alleged libel." *Id.* at 748.

3         *Gritchen* and *Laxalt* are easily distinguishable from this case. In both of those cases, the

4    government officials acted individually as wholly private citizens without the aid of any other

5    government official. That is not what happened here. At the legislators' request, the Office sent the

6    takedown demands to WordPress and Hoskins, which explicitly stated that the Office "represents the

7    California State Legislature." The letter concluded: "If these home addresses are not removed from this

8    Web site in a timely manner, *we reserve* the right to file an action seeking injunctive relief, as well as

9    associated court costs and attorney's fees." FAC at ¶ 19 (Emphasis added.). Unlike *Gritchen* and *Laxalt*,

10   this case does not involve a state employee's private attorney threatening legal action on behalf of one

11   individual. The Office informed WordPress and Hoskins that if they did not comply, the Office—on

12   behalf of the legislators—would consider legal action, including attempting to recover the Office's

13   statutorily available fees and costs. The Office, a government entity, therefore provided legal services on

14   behalf of 40 state legislators *at their request* and made that clear to WordPress and Hoskins when doing

15   so. In the Court's view, it is difficult to conceive how this could not constitute state action. *See Frey*,

16   789 F.3d at 1036.

17   **C.    Plaintiffs' First Amendment challenge**

18        Plaintiffs contend § 6254.21(c) is a content-based restriction on constitutionally protected speech

19   that violates the First Amendment on its face and as applied to them. *See* Doc. 19-1 at 15. Defendant

20   does not dispute the statute is content-based, but argues it is nonetheless lawful under the First

21   Amendment. *See* Doc. 20 at 15.

22        As to Plaintiffs' facial challenge, they contend § 6254.21(c) is impermissibly overbroad.  "[A]

23   law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional,

24   judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473

25   (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

"Technically, the overbreadth doctrine does not apply if the parties challenging the statute engage in the allegedly protected expression," as Plaintiffs did here, because the doctrine is used "to overcome what would otherwise be a plaintiff's lack of standing." *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997). "A party seeking to challenge the constitutionality of a statute generally must show that the statute violates the party's own rights," but "[t]he First Amendment overbreadth doctrine carves out a narrow exception to that general rule." *United States v. Stevens*, 559 U.S. 460, 483 (2010) (Alito, J., dissenting) (citations omitted). Plaintiffs, however, may still "seek, as a remedy, the facial invalidation of [a statute] if it is an overly broad regulation that create[s] an unacceptable risk of the suppression of ideas." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790 n.9 (9th Cir. 2006) (citation and quotation marks omitted).

But "because a successful overbreadth challenge renders a statute unconstitutional and, therefore, invalid in *all* its applications . . . the doctrine is employed sparingly and only as a last resort." *United States v. Alvarez*, 617 F.3d 1198, 1236 (9th Cir. 2010) (emphasis in original) (citations and quotation marks omitted), *aff'd*, 132 S.Ct. 2537 (2012). Accordingly, when a litigant brings both an as-applied and facial challenge, the Supreme Court has strongly suggested that courts should address the facial challenge only if the as-applied challenge fails. *See Serafine v. Branaman*, 810 F.3d 354, 363 n.19 (5th Cir. 2016) (collecting cases). The Court therefore turns first to Plaintiffs' as-applied challenge.

### 1.    Background on § 6254.12(c)

Section § 6254.21(c)(1)(A) prohibits anyone from posting or displaying the home address or telephone number of certain government officials, *see* § 6254.21(f), if the official makes "a written demand" that his or her personal information not be displayed. The written demand must "include a statement describing a threat or fear for the safety of that official or of any person residing at the official's home address." § 6254.21(c)(1)(B). A written demand is "effective for four years." § 6254.21(c)(1)(C). After receiving such a written demand, the recipient must remove the official's home address and/or phone number from the internet within 48 hours, and may not "transfer" it to anyone

1  through any medium. § 6254.21(c)(1)(D)(i)-(ii).

2  "An official whose home address or telephone number is made public as a result of a violation of

3  [§ 6254.21(c)(1)] may bring an action seeking injunctive or declarative relief." § 6254.21(c)(2). "If a

4  court finds that a violation has occurred, it may grant injunctive or declarative relief and shall award the

5  official court costs and reasonable attorney's fees." *Id.*

6  Briefly summarized, if someone publishes the home address or telephone number of certain

7  officials on the internet, those officials may demand that it be removed. The official must make the

8  demand in writing, and must describe the threat or fear for safety the official feels personally or for his

9  or her family who reside at the official's home address. Anyone who receives such a demand must

10  remove it within 48 hours, must takes steps to ensure it is not reposted, and may not communicate the

11  information to anyone through any medium. If the official's home address or telephone number "is made

12  public" because someone posted the information online without the official's consent, the official may

13  seek a court order to have the information removed from the internet. If the court finds that the

14  individual who posted the information online failed to comply timely with the official's demand, then

15  the court must award attorney's fees to the official, regardless of the relief the court orders.[7]

16  **2.      Section 6254.21(c) is content-based**

17  Section 6254.21(c)(1)(A) states, "[n]o person, business, or association shall publicly post or

18  publicly display on the Internet the home address or telephone number of any elected or appointed

19  [California] official" if the official makes a written demand that his or her personal contact information

20  be removed. An enforcing official could not determine whether § 6254.21(c)(1) applies to particular

21  speech without determining if (1) the speech contains a home address and/or phone number of (2) a

22  covered official. The statute is therefore content-based on its face: it applies only to speech that contains

23  certain content—the "home address or telephone number of any elected or appointed [California]

24  _____

25  [7] Defendant disputes how § 6254.21(c)'s attorney's fees and costs provision operates. The Court discusses its disagreement with Defendant's interpretation in a more relevant context below.

1  official." *See Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2227 (2015) ("Government regulation of

2  speech is content based if a law applies to particular speech because of the topic discussed or the idea or

3  message expressed." (citations omitted)); *see also S.O.C., Inc. v. Cty. of Clark*, 152 F.3d 1136, 1145 (9th

4  Cir. 1998) (holding that regulations that require officials to examine content of speech to determine

5  whether regulation applies are content-based (collecting cases)).

6      **3.    Analysis**

7      "Content-based laws—those that target speech based on its communicative content—are

8  presumptively unconstitutional and may be justified only if the government proves that they are

9  narrowly tailored to serve compelling state interests." *Reed*, 135 S.Ct. at 2226. This requires the

10  government to show that the law is "the least restrictive means to further a compelling interest." *Foti v.*

11  *City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998) (citation omitted). Because § 6254.21(c)(1) is

12  content-based, Defendant must establish that, when applied to Plaintiffs' speech, the statute is narrowly

13  tailored to a compelling state interest. *See Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966, 974 (9th Cir.

14  2009), *rev'd on other grounds*, 135 S.Ct. 2218.

15      "As a general matter, 'state action to punish the publication of truthful information seldom can

16  satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quoting *Smith v. Daily*

17  *Mail Pub. Co.*, 443 U.S. 97, 102 (1979)). "More specifically, [the Supreme Court] has repeatedly held

18  that 'if a newspaper lawfully obtains truthful information about a matter of public significance then state

19  officials may not constitutionally punish publication of the information, absent a need . . . of the highest

20  order.'" *Id.* at 527-28 (quoting *Daily Mail*, 443 U.S. at 103).[8]

21

22

---

23  [8] Individuals who use the internet to disseminate their speech, such as Plaintiffs, are entitled to full First Amendment
    protections. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997). ("We agree with [the district court's]
24  conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the
    internet].") Cases that concern other forms of media (*e.g.*, newspapers) therefore apply with full force to speech on the
25  internet.

a.        **The legislators' personal information is a matter of public significance**

Defendant suggests, in a footnote, that it is "questionable" whether the legislators' personal information is "a matter of public significance." Doc. 20 at 23 n.12. For decades, the Supreme Court has broadly held that "[p]ublic records by their very nature are of interest to those connected with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495 (1975).[9] Thus, several cases demonstrate that the First Amendment protects the right to publish highly personal information of private individuals, such as the names of rape victims and juveniles involved in legal proceedings, when they relate to matters of public concern.[10]

Viewed in isolation, the legislators' home address and phone numbers may not, in and of themselves, constitute "a matter of public significance." But when considered in the specific context of Plaintiffs' speech—political protest, which is "core political speech," with First Amendment protection "at its zenith," *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 186-87 (1996)—the information takes on new meaning. Publius searched publicly available documents and compiled, and headednorth reposted, the legislators' personal information specifically in response to legislation that required the government to maintain a database with the personal information of individuals who buy firearms and ammunition in California. When viewed in that context of political speech, the legislators' personal information becomes a matter of public concern. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of

---

[9] *Cox* concerned only information contained and placed into the public record through "official court records." 420 U.S. at 495. But the Supreme Court has long "recognize[d] a general right to inspect and copy public records and documents." *Nixon v. Warner Commnc'ns, Inc.*, 425 U.S. 589, 597 (1978). This is true even if the government inadvertently releases the information. *See Florida Star*, 491 U.S. at 534, 538 (holding First Amendment protected newspaper's publishing a rape victim's name that local police department had inadvertently released to the public).

[10] *See, e.g., Cox*, 420 U.S. at 496-97 (holding television reporter had First Amendment right to publish name of 17-year-old rape victim when learned through court documents); *Florida Star*, 491 U.S. at 526 (holding newspaper had First Amendment right to publish name of rape victim inadvertently disclosed by police); *Oklahoma Publishing Co. v. Dist. Ct.*, 430 U.S. 308, 308 (1977) (holding media had First Amendment right to publish name and photograph of 11-year-old involved in criminal proceedings that media had attended); *Daily Mail*, 443 U.S. at 99 (holding newspapers had First Amendment right to publish names of juvenile offenders)

political, social, or other concern to the community" (citation and quotation marks omitted)); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 417 (1971) (holding injunction on dispersing pamphlets with realtor's home phone number and urging recipients to call him to urge certain political stance was prior restraint that violated First Amendment). Four cases on which Plaintiffs primarily rely support this proposition well: *Florida Star*, 491 U.S. 524; *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244 (N.D. Fla. 2010); *Sheehan v. Gregoire*, 272 F.Supp.2d 1135 (W.D. Wash. 2003); and *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010).

*Florida Star* involved a challenge to a Florida statute ("§ 794.03") that made "it unlawful to 'print, publish, or broadcast ... in any instrument of mass communication' the name of the victim of a sexual offense." 491 U.S. at 524. A sheriff's department investigating a reported rape "prepared a report, which identified [the victim] by her full name, and placed it in the Department's press room," which was open to the public. *Id.* A reporter for *The Florida Star* "copied the press report verbatim, including [the victim's] full name," and subsequently published her full name in an article about the reported crime and the department's investigation of it. *Id.* at 528. The victim successfully sued *The Florida Star* under § 794.03 for publishing her name.

The Supreme Court reversed, and held the First Amendment prohibited imposing liability on *The Florida Star* for publishing the victim's name under the circumstances of the case. *Id.* at 537. The Court held that "the article generally, as opposed to the specific identity contained within it, involved a matter of paramount public import: the commission, and investigation, of a violent crime which had been reported to authorities." *Id.* at 536-37. The Court therefore concluded that, under its precedent, the article concerned "a matter of public significance." *See id.* at 536-37 ("*Cox Broadcasting*, *supra* (article identifying victim of rape-murder); *Oklahoma Publishing Co. v. Oklahoma County District Court*, 430 U.S. 308 (1977) (article identifying juvenile alleged to have committed murder); *Daily Mail*, *supra* (same); *cf. Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978) (article identifying judges whose conduct was being investigated).").

In *Brayshaw*, the plaintiff truthfully posted the personal information of a peace officer, including her personal address, phone number, and email, all of which was publicly available. 709 F. Supp. 2d at 1247. The plaintiff was charged with a misdemeanor for violating a Florida statute that provided:

> Any person who shall maliciously, with intent to obstruct the due execution of the law or with the intent to intimidate, hinder, or interrupt any law enforcement officer in the legal performance of his or her duties, publish or disseminate the residence address or telephone number of any law enforcement officer while designating the officer as such, without authorization of the agency which employs the officer, shall be guilty of a misdemeanor of the first degree.

*Id.* at 1247.

The court rather summarily rejected the government's argument that the plaintiff's speech was unprotected because it was not a matter of public significance. *Id.* at 1249. The court found that the issue of police accountability was "of legitimate public interest," and the "publication of truthful personal information about police officers is linked" to that interest "through aiding in achieving service of process, researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue." *Id.*

*Sheehan* involved an overbreadth challenge to a Washington statute that provided:

> A person or organization shall not, with the intent to harm or intimidate, sell, trade, give, publish, distribute, or otherwise release the residential address, residential telephone number, birthdate, or social security number of any law enforcement-related, corrections officer-related, or court-related employee or volunteer, or someone with a similar name, and categorize them as such, without the express written permission of the employee or volunteer unless specifically exempted by law or court order.

272 F. Supp. 2d at 1139. The plaintiff removed from his website the personal information of numerous officials covered by the statute, then challenged it as overbroad. *Id.* As in *Brayshaw*, the court found the officials' personal information to be a matter of public concern because it was related to the issue of police accountability and could be relevant "to achieve service of process, research criminal history, and to 'organize an informational picket [at individual officers' homes] or other lawful forms of civic involvement to force accountability.'" *Id.* at 1139, 1139 n.2.

*Ostergren*, 615 F.3d 263, a case Plaintiffs characterize as "closely analogous" to this one, is particularly illustrative here. In that case, the plaintiff brought an as-applied challenge to a Virginia statute that prohibited "[i]ntentionally communicat[ing] another individual's social security number ("SSN") to the general public." *Id.* at 266. "Calling attention to Virginia's practice of placing land records on the Internet without first redacting SSNs, [the plaintiff] displayed copies of Virginia land records containing unredacted SSNs on her website." *Id.* By doing so, she sought "to publicize her message that governments are mishandling SSNs and generate pressure for reform." *Id.* at 269 (footnote omitted). The information the plaintiff posted on her website was publicly available for a nominal fee, but her website made the public records "more accessible to the public than they [we]re through Virginia's [records] system." *Id.*

Before she could be prosecuted for posting the SSNs on her website, the plaintiff challenged the Virginia statute as applied to her website on First Amendment grounds. *Id.* As a threshold matter, the Fourth Circuit rejected the government's position that unredacted SSNs are entirely unprotected speech under the First Amendment. *Id.* at 271. The court reasoned that, in the plaintiff's case, the unredacted SSNs "are integral to her message," and, in fact, "they *are* her message" because her "[d]isplaying them proves Virginia's failure to safeguard private information and powerfully demonstrates why Virginia citizens should be concerned." *Id.* (emphasis in original and footnote omitted). Although the plaintiff could have redacted the SSNs, the First Amendment protected the plaintiff's "freedom to decide how her message should be communicated." *Id.* at 271 n.8. The Fourth Circuit therefore concluded that the plaintiff's speech "plainly concern[ed] a matter of public significance . . . because displaying the contents of public records and criticizing Virginia's release of private information convey political messages that concern the public, *see Cox Broad.*, 420 U.S. at 495, ('Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.')." *Id.* at 276 (citation omitted).

1    *Florida Star*, *Brayshaw*, *Sheehan*, and *Ostergren* thus show that highly personal information has

2    public significance when inextricably associated with political speech. That principle applies here.

3    Plaintiffs oppose, among other things, California legislation that requires the creation and maintenance

4    of a database run by the California Department of Justice that compiles the residential address and

5    telephone number of anyone who purchases or transfers firearms ammunition in California. *See* Cal.

6    Penal Code § 30352(a)(6). Plaintiffs' means of protesting the legislation is by compiling their own

7    "database" of the legislators' residential addresses and phone numbers. Like the plaintiff in *Ostergren*,

8    that information is not just "integral to [Plaintiffs'] message," it *is* their message. 615 F.3d at 271.

9         At its core, Plaintiffs' speech is a form of political protest.[11] The Court therefore finds that the

10    legislators' home address and telephone number touch on matters of public concern in the context of

11    Plaintiffs' speech.

12           **b.**     **§ 6254.21(c) is not narrowly tailored**

13         There is no dispute that Plaintiffs lawfully obtained and truthfully published information that was

14    readily available online. When lawfully obtained, the truthful publication of that information falls within

15    the First Amendment's ambit. *See Florida Star*, 491 U.S. at 524; *see also Bartnicki*, 532 U.S. at 516

16    (holding First Amendment protected radio commentator's playing anonymously and illegally wiretapped

17    recording on air). And as *Florida Star*, *Sheehan*, *Brayshaw*, and *Ostergren* demonstrate, when an

18    individual's personal information is relevant to issues of public significance, its truthful dissemination—

19    particularly when already in the public domain and lawfully obtained—triggers exacting First

20    Amendment scrutiny under Supreme Court precedent.[12] *See Florida Star*, 491 U.S. at 533. Specifically,

---

22    [11] Defendant does not suggest Publius's speech was a threat or otherwise not protected by the First Amendment.

23    [12] The Court is not suggesting that the truthful dissemination of an individual's personal information is always entitled to
First Amendment protections under any circumstance, even if it is already in the public domain. *See Florida Star*, 491 U.S. at
532 ("Nor need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent

24    with the First Amendment. Our cases have carefully eschewed reaching this ultimate question, mindful that the future may
bring scenarios which prudence counsels our not resolving anticipatorily." (collecting cases)). As the Fourth Circuit

25    recognized: "*Cox Broadcasting* and its progeny avoided deciding the ultimate question of whether truthful publication could
ever be prohibited. Each decision resolved this ongoing conflict between privacy and the First Amendment 'only as it arose

1   if an individual publishes lawfully obtained, "truthful information about a matter of public significance

2   then state officials may not constitutionally punish publication of the information, absent a need . . . of

3   the highest order." *Daily Mail*, 443 U.S. at 103. Any law that seeks to meet that need must be narrowly

4   tailored. *Florida Star*, 491 U.S. at 540-41.

5       The Court in *Florida Star* seemingly assumed without deciding that protecting a rape victim's

6   identity is a state interest "of the highest order," but held the challenged Florida statute was not narrowly

7   tailored to that interest for three reasons. *See Florida Star*, 491 U.S. at 538, 541; *see also id.* at 550

8   (White, J., dissenting). First, the state had released the victim's name, though inadvertently, in a publicly

9   available document. *Id.* at 538. The Court found that when "the government has failed to police itself in

10  disseminating information, it is clear . . . that the imposition of damages against the press for its

11  subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity,"

12  reasoning that the government's doing so "can only convey to recipients that the government considered

13  dissemination lawful, and indeed expected the recipients to disseminate the information further." *Id.* at

14  538-39.

15      Second, the Florida statute imposed a "negligence *per se* standard" in that it did not permit

16  "case-by-case findings" concerning liability, but instead imposed it "automatically." *Id.* at 539. Liability

17  followed publication regardless of the publisher's intent, and "regardless of whether the identity of the

18  victim is already known throughout the community; whether the victim has voluntarily called public

19  attention to the offense; or whether the identity of the victim has otherwise become a reasonable subject

20  of public concern-because, perhaps, questions have arisen whether the victim fabricated an assault by a

21  particular person." *Id.* The Court therefore concluded the statute imposed an impermissible "categorical

22  prohibition" even when "important First Amendment interests are at stake." *Id.*

23      Third, the Florida statute was facially underinclusive. *Id.* at 540. Although it prohibited

24

25

---

in a discrete factual context.'" *Ostergren*, 615 F.3d at 276 (quoting *Florida Star*, 491 U.S. at 530).

publication in "instrument[s] of mass communication," it did not prohibit the same information from being published and distributed through other means. *Id.* The Court noted that "[a]n individual who maliciously spreads word of the identity of a rape victim is thus not covered [by the statute], despite the fact that the communication of such information to persons who live near, or work with, the victim may have consequences as devastating as the exposure of her name to large numbers of strangers." *Id.* For these reasons, the Court held that *The Florida Star* could not be held liable under § 794.03 because the statute was not narrowly tailored under the facts of the case. *Id.* at 541.

In *Ostergren*, the court assumed without deciding that Virginia's asserted state interest was "of the highest order" because, even if it were, the statute was not narrowly tailored to that interest in the plaintiff's case. *Id.* at 280. The court succinctly reasoned that the statute could not be narrowly tailored to protecting individuals' privacy when Virginia made the records publicly available online and the plaintiff obtained the records through Virginia's online records system. *Id.* at 286. The court noted that, at the very least, Virginia could have redacted the SSNs before making the documents accessible to the public. *Id.* Accordingly, the Fourth Circuit held that the Virginia statute violated the First Amendment as applied to the plaintiff. *Id.* at 287.

The courts in *Brayshaw* and *Sheehan* likewise found the contested laws were not narrowly tailored without much difficulty. In *Brayshaw*, the court found that the challenged statute was both overinclusive and underinclusive. 709 F. Supp. 3d at 1249. The court reasoned:

> It is overinclusive in proscribing speech that is not a true threat. It is underinclusive both in its failure to prohibit dissemination of the same information by other entities to third-parties who do intend to harm or intimidate officers, and in its failure to punish parties who actually wish to harm or intimidate police officers and obtain the officer's identifying information.

*Id.* at 1249-50. Further, the court found that "punishing Plaintiff for his dissemination of information which is already publicly available is relatively unlikely to advance the interests claimed by the State." *Id.* (citing *Florida Star*, 491 U.S. at 535 ("punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the

1   State seeks to act")).

2        The court in *Sheehan* used largely the same reasoning. *See* 272 F. Supp. 2d at 1145.

3   Additionally, the court observed:

4        [W]hen the government itself injects personal identifying information into the public
         domain, it cannot credibly take the contradictory position that one who compiles and
5        communicates that information offends a compelling state interest. Further, defendants
         can demonstrate no compelling interest because the statute hinges solely on the subjective
6        intent of the speaker. Any third party wishing to actually harm or intimidate these
         individuals may freely acquire the personal identifying information from myriad public
7        and private sources, including for-profit commercial entities, without entering the scope
         of the statute.

8

9   *Id.* at 1147 (footnotes omitted).

10        The Court assumes that the interest underlying § 6254.21(c)—protecting the personal safety of

11   covered officials and their families—is a state interest of the highest order. But the Court need not

12   decide whether it is because the statute is not narrowly tailored to further that interest. The logic of

13   *Florida Star*, *Ostergren*, *Brayshaw*, and *Sheehan* applies here, and shows that there are a number of

14   reasons why § 6254.21(c) is not narrowly tailored.

15        First, § 6254.21(c) makes no attempt to prohibit or prevent true threats. Under the statute, a

16   covered official need only subjectively fear for his or her safety (or that of his or her family) due to his

17   or her home address or telephone number being online. § 6254.21(c)(1). To make a compliant request

18   that the information be removed, the official need only send the publisher of the information a

19   "statement describing a threat or fear for the safety of that official or of any person residing at the

20   official's home address." *Id.* If the official does so, the recipient must comply or face a lawsuit. An

21   official can therefore make an effective takedown demand by informing someone who has posted the

22   official's home address or phone number that doing so has made the official fear for his or her safety.

23   On its face, § 6254.21(c)(1) does not require that the threat be credible or that a third-party review

24   whether the official's request is well-founded. The statute makes no distinction between those who

25   publish a covered official's home address or phone number online for wholly lawful reasons and those

1   who do so for wholly unlawful reasons. So long as an official subjectively feels threatened, the official

2   may make a takedown request under § 6254.21(c)(1). And if the publisher fails to comply with an

3   official's takedown request within 48 hours, then he or she has violated § 6254.21(c)(1), which will

4   entitle the official to bring suit in which attorney's fees would be awarded automatically to the official.

5   *See id.* §§ 6254.21(D)(i), 6254.21(c)(2). This lack of case-by-case oversight and effective *per se* liability

6   suggests that § 6254.21(c) is not narrowly tailored. *See Florida Star*, 491 U.S. at 539.

7        Defendant disputes this characterization of the statute. *See* Doc. 20 at 25 n.15. Defendant argues

8   that § 6254.21(c)(2)'s mandatory attorney's fees and costs award does not impose "automatic liability"

9   for two reasons:

10        First, of course, no fees are awarded unless the Court has already determined that
   issuance of an injunction, with the resulting fee award, would not violate the First

11   Amendment. Second, it is well-established that attorney's fee awards under fee-shifting
   statutes like section 6254.21(c) are considered "costs," not "damages," and are not

12   provided to "punish" the defendant in any way but merely to ensure that the plaintiff will
   be fully compensated.

13   *Id.* (citations omitted). Defendant provides no authority for her first point, and the plain language of the

14   statute contradicts it. On its face, § 6254.21 does not contemplate a First Amendment defense, and no

15   court has found one applicable. (In fact, the Court cannot find any court decision that even mentions the

16   statute.) As the Court interprets the provision, under § 6254.21(c)(2), if a court finds that the defendant

17   has violated § 6254.21(c)(1)—that is, whether the defendant has failed to timely comply with a covered

18   official's appropriate and effective takedown request—then the court *must* award the plaintiff-official

19   attorney's fees and costs, regardless of the whether the court orders injunctive or declaratory relief.

20        Defendant's second point is a straw man. Regardless of whether attorney's fees are "damages,"

21   the imposition of attorney's fees and costs is a form of liability, particularly in the First Amendment

22   context, where even their mere potential may have a chilling effect on First Amendment rights. *See, e.g.*,

23   *Dean v. Riser*, 240 F.3d 505, 510 (5th Cir. 2001); *Riddle v. Egensperger*, 266 F.3d 542, 551 (6th Cir.

24   2001); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964) ("would-be critics of official

25

conduct may be deterred from voicing their criticism . . . because of doubt whether it can be proved in court *or fear of the expense of having to do so*" (emphasis added)). Defendant does not cite, and the Court cannot find, any authority that suggests First Amendment scrutiny of a content-based statute should be any different simply because attorney's fees and costs are the only financial relief possible under the statute.

Section § 6254.21(c)(1) is not narrowly tailored for the additional reason that it does not differentiate between acts that "make public" previously private information and those that "make public" information that is already publicly available. There is no dispute that the information Publius compiled and posted, and a member of Hoskins's forum re-posted, was publicly available and readily accessible online. "[P]unishing [Plaintiffs] for [their] dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star*, 491 U.S. at 535. When "the government has failed to police itself in disseminating information, it is clear . . . that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means" to further the state's interests. *Id.* at 538. Because the information Plaintiffs published came from freely available public records, § 6252.21(c)(1) is not narrowly tailored to protecting the safety of covered officials and their families. *See id.*; *Ostergren*, 615 F.3d at 286.[13]

Third, § 6254.21(c)(1) is underinclusive. *See Florida Star*, 491 U.S. at 540 (holding that statute was not narrowly tailored in part because it was underinclusive on its face). A statute is underinclusive when it affects "too little speech," such that there are "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Williams-Yulee v. Florida Bar*, 135 S.Ct. 1656, 1668 (2015) (emphasis, quotation marks, and citation omitted).

---

[13] Plaintiffs also point out that the voter registration affidavit of any voter, which includes his or her "home address, telephone number, [and] email number," Cal. Elec. Code § 625.4, "[s]hall be provided with respect to any voter . . . to any person for election, scholarly, journalistic, or political purposes." Cal. Elec. Code § 2194(a)(3). So, even if the legislators' personal information was not freely available online, Plaintiffs potentially could have obtained it through lawful means.

1  "The Supreme Court has looked skeptically on statutes that exempt certain speech from regulation,

2  where the exempted speech implicates the very same concerns as the regulated speech." *Chaker v.*

3  *Crogan*, 428 F.3d 1215, 1227 (9th Cir. 2005) (citations omitted). In *Florida Star*, for instance, the

4  challenged statute only prohibited the publication of information identifying a rape victim on "an

5  instrument of mass communication." 491 U.S. at 540. That the statute did not prohibit the same

6  information being spread by other means raised "serious doubts" as to whether the statute was serving

7  the interests it purportedly served. *Id.* at 525, 540.

8       Section 6254.21(c)(1) is similarly underinclusive. It proscribes the dissemination of a covered

9  official's home address and phone number only on the internet, regardless of the extent to which it is

10 available or disseminated elsewhere.[14] That the statute does not prohibit a major newspaper[15] or

11 television channel from publishing the information, but would potentially prohibit an online blog with a

12 limited audience from doing so, raises serious questions about whether it is serving its intended goals.

13 *See id.* "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a

14 restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest

15 unprohibited." *Id.* at 541-42 (Scalia, J., concurring) (citation and quotation marks omitted).

16      The Court therefore concludes § 6254.21(c)(1) is not narrowly tailored to serve its underlying

17 interests. In addition, because the statute is content-based, Defendant had to show that it is "the least

18 restrictive means to further a compelling interest." *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (1998)

19 (citation omitted). Defendant has failed to do so. In fact, Defendant made no attempt to explain how §

20 6254.21 is the least restrictive means to further the statute's goal of protecting covered officials. As

21 noted above, the statute could be less restrictive in that it could proscribe only true threats, or it could

22 _____

23 [14] The statute does prohibit the recipient of an official's takedown demand from "transfer[ring]" the information on "any other medium." § 6254.21(c)(1)(D)(ii). But there can be no liability under § 6254.21(c)(1) unless an official's home address

24 or phone number is posted on the internet.

25 [15] Ironically, a newspaper could face no liability under § 6254.21(c)(1) for publishing in print the same information that it posts online.

1  require a neutral third-party to determine if the official's fear is objectively sound, or it could permit an

2  objective case-by-case determination for liability instead of permitting a covered official to trigger its

3  protections due to the official's subjective concerns. In summary, the Court finds that Plaintiffs are

4  likely to succeed on their claim that § 6254.21(c)(1) is unconstitutional as applied to them.

5  **D.      Hoskins's Commerce Clause challenge[16]**

6          Plaintiffs contend that § 6254.21(c) violates the dormant Commerce Clause as applied to

7  Hoskins and out-of-state actors[17] because the statute restricts speech that occurs wholly outside

8  California's borders. Doc. 19-1 at 23 (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) ("The

9  'Commerce Clause . . . precludes the application of state statutes to commerce that takes place wholly

10  outside of the State's borders, whether or not the commerce has effects within the State").

11          Defendant counters that the extraterritoriality doctrine articulated in *Healy* does not apply to §

12  6254.21(c) because the statute does not control prices. Doc. 20 at 26. Defendant argues that, even if the

13  doctrine applies, "[§] 6254.21(c) does not significantly burden interstate commerce." *Id.* at 27.

14  Specifically, Defendant asserts that the statute does not project any regulatory regimes or affirmative

15  obligations onto Hoskins, but rather "authorizes California public officials to request to have certain

16

17  ――――――――――――――――――

[16] Under the canon of constitutional avoidance, a court should avoid deciding unnecessary constitutional issues. *See*
18  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936). The doctrine generally applies only when "there is a viable alternate, nonconstitutional ground to reach the same result." *Ariz Dream Act Coal. v. Brewer*, __ F.3d __, 2017 WL 461503, at *6 (9th Cir. Feb. 2, 2017) (citations omitted). But when a plaintiff challenges a law on multiple constitutional grounds, courts have
19  discretion to decide which ground (or grounds) on which to decide the case. *Compare Am. Booksellers Found. V. Dean*, 342 F.3d 96, 102-03 (2d Cir. 2003) (finding federal statute unconstitutional under First Amendment and dormant Commerce
20  Clause), *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (same) *with Old Coach Dev. Corp., Inc. v. Tanzman*, 881 F.2d 1227, 1231 n.2 (3d Cir. 1989) (declining to address whether challenged statute violated the First Amendment after
21  finding that it violated the dormant Commerce Clause). And because the Court concludes Hoskins's § 230 challenge is unlikely to succeed, the Court may address his constitutional claims.

22  [17] It appears Plaintiffs' Commerce Clause claim is an as-applied challenge brought by Hoskins only. *See* FAC at 17 ¶ 2 ("Plaintiff Hoskins respectfully requests that this Court enter a declaratory judgment stating that applying California
23  Government Code section 6254.21(c) to Hoskins' out-of-state speech violates the Commerce Clause."); *see also id.* at ¶ 45 ("The application of Section 6254.21(c) to out-of-state actors like Hoskins violates the so-called dormant Commerce
24  Clause"), ¶ 53 ("Defendant, acting under color of state law, has applied California Government Code section 6254.21(c) in violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, thus in turn violating 42 U.S.C. § 1983."). To the extent Hoskins brings both a facial and as-applied dormant Commerce Clause challenge, the Court need only address his as-applied
25  challenge.

1    specifically identified sensitive personal information removed from a particular post." *Id.* Although

2    Defendant acknowledges that § 6254.21(c) requires Hoskins to remove the information specific in the

3    Office's takedown request or face the possibility of a suit for injunctive and declaratory relief,

4    Defendant argues that § 6254.21(c) does not impose any substantial burden on Hoskins. *Id.* Defendant

5    also contends there is no evidence that § 6254.21(c) conflicts with or is incompatible with New

6    Hampshire or any other State's laws. *Id.*

7        "[A]s both the means to engage in commerce and the method by which transactions occur, 'the

8    Internet is an instrumentality and channel of interstate commerce,'" *United States v. Sutcliffe*, 505 F.3d

9    944, 953 (9th Cir. 2007) (quoting *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (per

10   curiam)). Thus, "regulation of the Internet impels traditional Commerce Clause considerations."

11   *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 173 (S.D.N.Y. 1997).

12       "The Commerce Clause of the United States Constitution assigns to Congress the authority '[t]o

13   regulate Commerce with foreign Nations, and among the several States.'" *Sam Francis Foundation v.

14   Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (quoting U.S. Const. art. I, § 8, cl. 3). "Generally

15   speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of

16   one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336.

17       "Courts have long read a negative implication into the clause, termed the 'dormant Commerce

18   Clause,' that prohibits states from discriminating against interstate commerce." *Yakima Valley Mem'l

19   Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 846 (9th Cir. 2013). The doctrine "bars state

20   regulations that unduly burden interstate commerce." *Quill Corp. v. North Dakota*, 504 U.S. 298, 312

21   (1992) (citation omitted). "[A] statute violates the dormant Commerce Clause per se when it directly

22   regulates interstate commerce." *Pharm. Research and Mfrs. of America v. Cty. of Alameda*, 768 F.3d

23   1037, 1043 (9th Cir. 2014) (quoting *Assoc. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729

24   F.3d 937, 949 (9th Cir. 2013)) (internal quotation marks omitted). "Direct regulation occurs when a state

25   law directly affects transactions that take place across state lines or entirely outside of the state's

1    borders." *Id.* (quoting *S.D. Myers, Inc. v. City and Cty. of S.F.*, 253 F.3d 461, 467 (9th Cir.2001))

2    (internal quotation marks omitted).

3           Under the extraterritoriality doctrine, any "statute that directly controls commerce occurring

4    wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and

5    is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature,"

6    *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013) ("*RMFU*") (quoting

7    *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)), and regardless of "whether or not the commerce has

8    effects within the State." *Healy*, 491 U.S. at 336. To determine whether state legislation violates the

9    dormant Commerce Clause, "[t]he critical inquiry is whether the practical effect of the [legislation] is to

10   control conduct beyond the boundaries of the State." *Id.*

11          "Although the Ninth Circuit has not reached this issue, courts in several circuits have invalidated

12   state laws regulating the internet" where the statute regulates conduct occurring outside the borders of

13   the state. *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F.Supp. 2d 946, 958 (N.D. Cal. 2006) (collecting

14   cases). In contrast, courts have upheld state regulation of the internet where application of the law has

15   been limited to only local conduct, or where "[a] state would enforce the law only against conduct

16   occurring within the state." *Id.* (collecting cases); *see also Greater Los Angeles Agency on Deafness,*

17   *Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 432-33 (9th Cir. 2014) ("*Agency on Deafness*")

18   (holding that California statute that required captioning of online videos for California viewers did not

19   regulate out-of-state conduct because CNN could create a separate website specific to California users).

20          Defendant claims that the extraterritoriality doctrine articulated in *Healy* is inapplicable to this

21   case because *Healy* has been limited to its facts, namely, "price control or price affirmation statutes that

22   involve tying the price of . . . in-state products to out-of-state prices." Doc. 20 at 26. For support,

23   Defendant cites to *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 669 (2003),

24   *Harris*, 729 F.3d at 951, and *RMFU*, 730 F.3d at 1101.

25          These cases do not support Defendant's position. *Walsh*, *Harris*, and *RMFU* all concerned state

1  laws that regulated in-state conduct which were found not to directly regulate extraterritorial behavior,

2  and thus, *Healy* was inapplicable. *See Walsh*, 538 U.S. at 669 ("the Maine Act does not regulate the

3  price of any out-of-state transaction, either by its express terms or by its inevitable effect"); *Harris*, 729

4  F.3d at 951 ("Section 25982 applies to both California entities and out-of-state entities and precludes

5  sales within California of products produced by force feeding birds regardless of where the force feeding

6  occurred.")[18]; *RMFU*, 730 F.3d at 1104 ("[California] does not control the production or sale of ethanol

7  wholly outside California."). As the Ninth Circuit observed in *RMFU*, "[c]ourts have extended the

8  [extraterritoriality] rule from *Healy* and *Brown-Forman* to cases where the 'price' floor being imposed

9  on another jurisdiction was not monetary but rather a minimum standard of environmental protection."

10  730 F.3d at 1102.

11    *Sam Francis Foundation*, 784 F.3d at 1323-24, and *Agency on Deafness*, 742 F.3d at 432-33, a

12  case Defendant cites (albeit for a different proposition), make clear that extraterritoriality doctrine

13  applies beyond statutes that regulate out-of-state prices. *Sam Francis Foundation* involved a challenge

14  to California's Resale Royalty Act, which required "the payment of royalties to the artist after a sale of

15  fine art whenever 'the seller resides in California *or* the sale takes place in California.'" 784 F.3d at

16  1323 (emphasis in original). The plaintiff challenged the statute as violating the dormant Commerce

17  Clause because it regulated sales that took place outside California. *Id.* The Ninth Circuit "easily

18  conclude[d]" that the royalty requirement violated the dormant Commerce Clause because it mandated

19  that royalties be paid for sales that had no connection to California. *Id.*

20    *Agency on Deafness* involved the California Disabled Person Act ("DPA"), a law having nothing

21

---

22  [18] The court in *Harris* analyzed the statute at issue for whether it was directed wholly at extraterritorial activity. 729 F.3d at 949. While the court did not explicitly mention *Healy* during its analysis, it applied the extraterritoriality doctrine to

23  determine that the statute was not directed solely at out-of-state producers. *Id.* To the extent Defendant relies on the court's statement that "*Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product" for support that

24  the extraterritoriality doctrine is limited to price-fixing statutes, the court's own application of the extraterritoriality doctrine in that case to a statute that does not dictate the price of a product undermines Defendant's argument. *Id.* at 951. Furthermore, subsequent decisions apply *Healy* and the extraterritoriality doctrine to non-price-fixing statutes. *See, e.g.*, *Sam Francis*

25  *Found.*, 784 F.3d at 1323-24.

1  to do with prices or sales of any kind.[19] 742 F.3d at 419. The plaintiffs in that case argued that the

2  defendant's failure to provide closed captioning for its online videos for California viewers violated the

3  DPA, which mandated the captioning. *Id.* The defendant argued the DPA violated the dormant

4  Commerce Clause because it attempted to regulate conduct wholly outside of California. *Id.* at 433. The

5  Ninth Circuit rejected the argument, holding instead that the DPA did not have the practical effect of

6  regulating conduct outside of California because the defendant could enable close captioning for

7  California residents only, thereby limiting the statute's effect to California's borders. *Id.* Although the

8  court found that the DPA did not violate the dormant Commerce Clause, there is no indication that the

9  plaintiffs' challenge under that provision was improper.

10       Accordingly, the Court finds that Defendant's contention that the extraterritoriality doctrine is

11  limited to price control or price affirmation statutes is without merit. The Court now turns to analyze §

12  6254.21(c) for its extraterritorial effects as applied to Hoskins and out-of-state actors. "Because the

13  internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate

14  internet activities without project[ing] its legislation into other States." *Am. Booksellers Found. v. Dean*,

15  342 F.3d 96, 103 (2d Cir. 2003) (internal quotation marks omitted). For example, if "[a] person outside

16  [California] posts information on a website or on an electronic discussion group . . . for the intended

17  benefit of other people [outside California], that person must assume that someone from [California]

18  may also view the material." *Id.* As a result, posters outside of California must comply with §

19  6254.21(c) or risk subsequent litigation and attorney's fees. California therefore has projected §

20  6254.21(c) "onto the rest of the nation." *Id.*

21       Defendant's alternative argument that § 6254.21(c) does not significantly burden interstate

22  commerce ignores that § 6254.21(c) as applied to out-of-state actors, such as Hoskins, directly regulates

23  wholly out-of-state conduct. Section 6254.21(c) requires the recipient of a demand letter—anywhere in

24  ────────────────

25  [19] The California Disabled Person Act assures that "[i]ndividuals with disabilities or medical conditions have the same rights as the general public to the full and free use" of public places and areas open to the public. Cal. Civ. Code §§ 54(a)-(b).

31

1   the country—sent by an elected official to remove the "official's home address or telephone number

2   from public display on the internet," and to "continue to ensure that this information is not reposted on .

3   . . any . . . Internet Web site maintained by the recipient of the written demand." Cal. Gov. Code. §

4   6254.21(c)(1)(D)(i). It also prohibits the demand recipient from "transfer[ring] the appointed or elected

5   official's home address or telephone number to *any* other person, business, or association through *any*

6   other medium." Cal. Gov. Code. § 6254.21(c)(1)(D)(ii) (emphasis added). The statute does not limit its

7   application to California, nor does it require that websites displaying officials' home address or

8   telephone numbers bar California only internet users' access. *See Agency on Deafness*, 742 F.3d at 432-

9   33 (rejecting dormant Commerce Clause challenge to statute requiring website to provide captioning for

10  California residents who access its online videos because captioning could be limited to only California

11  residents).

12      Rather, § 6254.21(c) requires Hoskins, a Massachusetts resident, to remove a post from his

13  online forum, FAC ¶ 45, and mandates that he "continue to ensure that [the legislators' contact

14  information] is not reported on the forum or any other website maintained by him," Doc. 19-1 at 23

15  (internal quotation marks omitted), even if the only people accessing the forum are New Hampshire

16  residents (or citizens of states other than California). Section § 6254.21(c) also prohibits Hoskins from

17  transferring the specified information to any other entity, "through any medium," even if Hoskins and

18  the recipient have no connection to California or the transfer "takes place wholly outside of the State's

19  borders." *Healy*, 491 U.S. at 336. Thus, California has projected § 6254.21(c) "onto the rest of the

20  nation." *Dean*, 342 F.3d at 103. The Court therefore concludes that Hoskins is likely to succeed on his

21  claim that § 6254.21(c), as applied to out-of-state actors like Hoskins, violates the dormant Commerce

22  Clause. *See Sam Francis Found.*, 784 F.3d at 1324 (holding that statute "regulating out-of-state art sales

23  where 'the seller resides in California,' . . . and no other connection to California need exist, violates the

24  dormant Commerce Clause as an impermissible regulation of wholly out-of-state conduct."); *see also*

25  *Dean*, 342 F.3d at 103 (holding that Vermont statute that directly regulated speech on the internet

1  outside of Vermont was a "*per se* violation of the dormant Commerce Clause").

2  **E.    Hoskins's § 230 challenge**

3         Under § 230(c)(1) "[n]o provider ... of an interactive computer service shall be treated as the

4  publisher or speaker of any information provided by another information content provider." Under §

5  230(e), "[n]o cause of action may be brought and no liability may be imposed under any State or local

6  law that is inconsistent with this section." Section 230 therefore "precludes liability that treats a website

7  as the publisher or speaker of information users provide on the website. In general, this section protects

8  websites from liability for material posted on the website by someone else." *Doe v. Internet Brands,*

9  *Inc.*, 824 F.3d 846, 850 (9th Cir. 2016). More specifically, § 230 immunity applies when "(1) the

10  defendant [is] a provider or user of an interactive computer service; (2) the cause of action treat[s] the

11  defendant as a publisher or speaker of information; and (3) the information at issue [is] provided by

12  another information content provider." *Hassell v. Bird*, 247 Cal. App. 4th 1336, 1362 (2016) (citation

13  and quotation marks omitted).

14         Hoskins claims that, as owner and operator of Northeastshooters.com, he is a "provider of an

15  interactive computer service" under § 230(c)(1), who is entitled to immunity from any liability for the

16  content created on the website by third parties. Doc. 19-1 at 24 (citing § 230(c)). He argues that the

17  Office's takedown request "treat[s] [him] as the publisher or speaker of third-party content in violation

18  of § 230." Doc. 19-1 at 24 (internal quotation marks omitted). Hoskins further asserts § 6254.21(c) is

19  inconsistent with § 230(e), which provides that "[n]o cause of action may be brought and no liability

20  may be imposed under any State or local law that is inconsistent with this section." *See* FAC at ¶ 56.

21  Hoskins therefore requests "a declaratory judgment stating that the Defendant has violated his rights

22  under Section 230." *Id.* at 17 ¶ 3.[20]

23         Defendant takes no position on whether Hoskins qualifies as "a provider of an interactive

24  

25  
_____

[20] The Court notes that this is a particularly narrow request and, accordingly, the Court limits its analysis to its confines.

1   computer service" or whether he is entitled to immunity under § 230(c). *See* Doc. 20 at 28. Instead,

2   Defendant argues that § 6254.21(c) is entirely consistent with § 230(c) in that both preclude Hoskins

3   from facing any liability because "subdivision (e) of section 6254.21 . . . provides Hoskins with the

4   same immunity from liability, using the exact same definition of interactive computer service, as does

5   47 U.S.C. § 230." *Id.*[21]

6          Hoskins's claim is premised on the assumption that the Office's takedown request violates his

7   § 230 immunity. Although the Office's takedown demand may have erroneously assumed Hoskins

8   qualified as a "publisher" or "speaker" of the speech at issue here (headednorth's re-posting the

9   legislators' personal information)—an issue the Court need not and does not decide—the demand did

10   not violate his purported immunity under § 230.[22]

11          To the extent Plaintiffs assert § 6254.21(c)'s mandatory attorney's fees provision violates § 230,

12   that issue is not properly before the Court. As explained in detail above, attorney's fees are not available

13   under § 6254.21(c) unless and until (1) the plaintiff brings a lawsuit in state court for declaratory and/or

14   injunctive relief and (2) the court finds that the defendant violated § 6254.21(c)(1). If the defendant

15   asserts it is entitled to § 230 immunity as an "interactive computer service provider or access software

16   provider," the court would have to determine (1) whether that is correct; and, if so, (2) whether imposing

17   attorney's fees would amount to "liability" in violation of § 230 immunity; and, if so, (3) whether §

18   6254.21(e) precludes a fee award. Those issues are not ripe for the court's review.

19          Though not on all fours with the facts of this case, *Google, Inc. v. Hood*, 822 F.3d 212, 225-26

20   (5th Cir. 2016), guides the Court's analysis here as the only analogous case the Court can find. *Hood*

---

21   [21] Section 6254.21(e) provides in full:

22          (e) An interactive computer service or access software provider, as defined in Section 230(f) of Title 47 of
            the United States Code, shall not be liable under this section unless the service or provider intends to abet

23          or cause imminent great bodily harm that is likely to occur or threatens to cause imminent great bodily
            harm to an elected or appointed official.

24   [22] Neither party addresses whether Hoskins has standing to assert his § 230 claim. The Court notes, however, that the Office's

25   threat to bring suit under § 6254.21(c) is sufficient to confer Hoskins with standing to bring the claim. *See MedImmune, Inc.
     v. Genentech, Inc.*, 549 U.S. 118, 118-19 (2007).

involved Google's declaratory judgment challenge to a state attorney general's administrative subpoena

that "sought information on Google's platforms, advertising practices, and knowledge of and efforts to

police 'dangerous' or 'illegal' content." *Id.* at 218. The subpoena stated that if Google refused to

comply, the attorney general "'may apply to' a state court 'for an order compelling compliance.'" *Id.*

      Before responding to the subpoena or seeking relief in state court, Google filed a declaratory

judgment case in federal court. *Id.* at 219. Google alleged, among other things, that the attorney

general's investigation violated its § 230 immunity, and that any further proceedings to enforce the

subpoena would likewise violate that immunity. *Id.* at 219-20. The attorney general moved to dismiss

the case on numerous grounds, including that Google's claims were not ripe for adjudication. *See*

*Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 592 (S.D. Miss. 2015), *rev'd*, 822 F.3d 212. The district court

disagreed, and found that the claims were ripe because "Google is not required to expose itself to civil or

criminal liability before bringing a declaratory action to establish its rights under federal law,

particularly where the exercise of those rights have been threatened or violated." *Id.* at 594 (citing

*MedImmune*, 549 U.S. at 128-29).

      The Fifth Circuit reversed, holding that the "administrative subpoena was not ripe for

adjudication." *Hood*, 822 F.3d at 224. The court so held because (1) the subpoena was "non-self-

executing," meaning that Google could not be sanctioned for not complying with it; (2) the attorney

general could, but did not file a state court action to enforce Google's compliance; and (3) if the attorney

general did file such a suit, Google could raise its claimed § 230 immunity as a defense. *See id.* at 224-

26; *see also id.* at 227 n.12 ("[W]e do not suggest that section 230 of the CDA would not apply if Hood

were to eventually bring an enforcement action, or cannot be applied at the motion-to-dismiss stage.").

For these reasons, the Fifth Circuit held that Google's "pre-enforcement challenge" was unripe. *Id.* at

226.

      This is consistent with the Court's understanding that § 230 immunity is an affirmative defense.

*See Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *Doe v. GTE Corp.*, 347 F.3d 655,

657 (7th Cir. 2003); *Barnes*, 570 F.3d at 1109. As the Ninth Circuit explained, § 230(c)(1) "*only* protects

from liability (1) a provider or user of an interactive computer service (2) whom a *plaintiff* seeks to treat,

*under a . . . cause of action*, as a publisher or speaker (3) of information provided by another

information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009)

(emphasis added); *see also Fed. Trade Comm'n v. Leadclick Media, LLC*, 838 F.3d 158, 173 (2d Cir.

2016 (observing that courts have interpreted § 230 to provide immunity from "claims"). Section

230(c)(1) therefore "protects certain internet-based actors from certain kinds of *lawsuits*." *Barnes*, 570

F.3d at 1099 (emphasis added)); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)

(holding "lawsuits seeking to hold a service provider liable [for third party content] . . . are barred"

under § 230(c)(1)).

　　　　As § 6254.21(c) and the demand letter make clear, the only liability Hoskins faced was a

potential lawsuit and attorney's fees and costs if he failed to comply with the Office's request. Despite

extensive research, the Court cannot find any authority that suggests the Office's letter even triggers

Hoskins's purported § 230 immunity, much less violates it, as the letter is not a "cause of action," and

did not impose any kind of "liability" on Hoskins—even if he ignored it. *See Barnes*, 570 F.3d at 1099;

*Hassell*, 247 Cal. App. 4th at 1363 ("The [court's] removal order does not violate section 230 because it

does not impose any liability on Yelp."). Assuming that Hoskins is entitled to § 230 immunity, Hoskins

does not cite, and the Court cannot find, any case holding that the mere *threat* of a lawsuit that

ostensibly would violate his § 230(c) immunity constitutes a violation of § 230 itself. Likewise, the

Court is unaware of any authority that suggests the Court has jurisdiction over a declaratory judgment

claim that a threatened lawsuit would violate § 230. *Hood*, the only case with similar circumstances the

Court can locate, suggests otherwise. Accordingly, the Court finds that Hoskins's claim that Defendant

"violated Hoskins' rights under Section 230," FAC at ¶ 55, is not ripe for review.[23] Hoskins is therefore

---

[23] Because of this conclusion, the Court need not address Hoskins's alternative argument that § 6254.21(e) is inconsistent

1    not likely to succeed on the merits of his § 230 claim.

2    **F.    Remaining preliminary injunction factors**

3           As outlined above, the Court finds that Plaintiffs are likely to succeed on the merits of their

4    challenges to § 6254.21(c) under the First Amendment and the Commerce Clause. "Both [the Ninth

5    Circuit] and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for

6    even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San*

7    *Clemente*, 584 F.3d 1196, 1207-08 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The harm is

8    particularly irreparable where, as here, [Plaintiffs] seek[] to engage in political speech." *Id.* Plaintiffs

9    have "therefore demonstrated a likelihood of irreparable injury in the absence of an injunction." *Id.*

10          Plaintiffs have also demonstrated that an injunction is in the public interest, and that the equities

11   tip in their favor. The Ninth Circuit has broadly held that "it is always in the public interest to prevent

12   the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012);

13   *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("the [district] court acknowledged the

14   obvious [when issuing an injunction]: enforcement of an unconstitutional law is always contrary to the

15   public interest" (collecting cases)). Further, any "ongoing enforcement of the potentially

16   unconstitutional regulations . . . would infringe not only the free of expression interests of [Plaintiffs],

17   but also the interests of other people" subjected to § 6254.21(c). *Klein*, 584 F.3d at 1208 (quoting

18   *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). "The balance of equities and the

19   public interest thus tip sharply in favor of enjoining the [statute]." *Id.*; *see also id.* (noting that Ninth

20   Circuit "caselaw clearly favors granting preliminary injunctions to a plaintiff . . . who is likely to

21   succeed on the merits of his First Amendment claim"). Accordingly, the Court finds that a preliminary

22

23   with § 230 because the former excludes immunity for interactive computer service providers, as defined in § 230(f), if the
     "provider intends to abet or cause imminent great bodily harm that is likely to occur or threatens to cause imminent great
24   bodily harm to an elected or appointed official." First, Hoskins made this argument for the first time in reply. Doc. 22 at 11;
     *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to
25   consider arguments raised for the first time in a reply brief."). Second, it is questionable whether Hoskins can challenge that
     aspect of § 6254.21(e), which is wholly inapplicable to this case.

injunction restraining and enjoining the Office from enforcing § 6254.21(c) against Plaintiffs is proper.[24]

## V. CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that Plaintiffs are likely to succeed on their claims that § 6254.21(c) violates the First Amendment as applied to them, and also violates the dormant Commerce Clause as applied to Hoskins. The Court further finds that the remaining preliminary injunction factors weigh in Plaintiffs' favor. The Court therefore preliminarily RESTRAINS AND ENJOINS Defendant from applying or enforcing § 6254.21(c) against Plaintiffs.

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to be wrongfully enjoined or restrained." Plaintiffs request that the Court set a nominal bond of $1.00. Doc. 19-5 at 2. Defendant offers no opinion on the matter, and has not indicated it will suffer any financial loss as a result of the injunction. Accordingly, Plaintiffs shall post a nominal bond of $1.00 before the preliminary injunction will issue.

On or before March 10, 2017, the parties shall file a joint status report informing the Court how they wish to proceed.

IT IS SO ORDERED.

Dated:   **February 27, 2017**          **/s/ Lawrence J. O'Neill**
                                  UNITED STATES CHIEF DISTRICT JUDGE

---

[24] Because the Court only addressed Plaintiffs' as-applied challenge and because Plaintiffs ask only for an order directing the Office not to enforce § 6254.21(c) against them, *see* Doc. 19-1 at 26, the Court limits the preliminary injunction to preclude enforcement of § 6254.21(c) against Plaintiffs only.